ALBERT O'NEAL SCOTT, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 24014

July 7, 1994 877 P.2d 503

*McDonald & Ewing,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex
Bell,* District Attorney, and *James Tufteland,* Chief Deputy Dis-
trict Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Appellant Albert O'Neal Scott, an ex-felon, was sitting in the rear seat of a vehicle which was pulled over upon suspicion of being stolen. The vehicle contained firearms, including a loaded 12-gauge shotgun on the floor of the rear seat, and Scott was carrying 12-gauge shotgun shells on his person. Scott was subsequently convicted of being an ex-felon in possession of a firearm and was sentenced as an habitual criminal to sixteen years in prison. Scott raises numerous assignments of error on appeal, one of which is meritorious.

We are persuaded that the State's post-conviction filing of a habitual criminal charge foreclosed assurance on review that Scott's pre-trial waiver of the right to counsel was knowing and intelligent. We therefore reverse and remand for a new trial in order to provide Scott the opportunity to secure counsel, now that he is aware that upon conviction, the State may seek to enhance his sentence by having him declared an habitual criminal. In the event Scott elects to again represent himself, he will be fully aware of the potential consequences of the failure of his own

representation. We also conclude that appellant's Fourth Amendment arguments are without merit and that the evidence introduced against him below may again be utilized in his new trial.

## FACTS

In the early morning hours of October 8, 1991, Las Vegas Metropolitan Police Department Officer Darrin Densley observed a white Buick Regal at the intersection of Jones and Smoke Ranch roads. Densley noticed that the vehicle's license plate was dangling and improperly secured to the vehicle. Officer Densley followed the vehicle while obtaining a DMV license check, which revealed that the license was registered to an Oldsmobile, rather than a Buick. Officer Densley then stopped the vehicle and ordered the occupants to exit. One of the occupants of the car, who was sitting in the rear right passenger's seat, was Scott.

As the occupants of the vehicle were exiting the car, Officer Finley arrived to assist Officer Densley. Several other officers were also present for what followed. Officer Finley testified that once the occupants of the vehicle were lined up, he proceeded to their vehicle "to make sure there were no other occupants and to check for weapons." Immediately upon opening the front passenger door, Officer Finley saw a loaded .38 caliber revolver on the floor between the passenger's seat and the door. The officer informed Officer Densley of the presence of the weapon, whereupon Officer Densley then proceeded to handcuff and pat down Scott and the other suspects, discovering three 12-gauge shot gun shells in Scott's right front pants pocket. Officer Finley then returned to the vehicle to determine for the safety of the officers whether there were any more weapons. On the floor area of the back seat, he discovered a fully loaded 12-gauge shotgun in a hefty plastic bag, "just like a garbage bag," along with eight more shotgun shells. A .22 semi-automatic pistol and additional .38 caliber ammunition were also retrieved.

It was ultimately discovered that the vehicle was not stolen, but Officer Densley justified the search of the vehicle by noting that at the time it was stopped, the officers had reason to believe that it was stolen, and that "[o]ftentimes when it is stolen and it's a felony vehicle offense then we check the vehicle out for the officer's safety to ascertain if there are any weapons in the vehicle." Officer Densley also testified that "if there is a possibility the vehicle is stolen or a possible felony vehicle, we are not going to approach the vehicle as a normal routine traffic stop. We treat it as if there may be possible felony suspects in the vehicle and we will have them exit the car."

The occupants of the car were initially arrested for possession of stolen property, as two of the guns found in the vehicle were

determined to be stolen. However, Scott was ultimately charged and tried for the crime of possession of a firearm by an ex-felon, a felony in violation of NRS 202.360. Scott had formerly been convicted of the felonies of murder and attempted murder (in 1975) and selling the credit card of another (in 1987). The jury only heard evidence of the credit card conviction, after the district court determined that the 1975 felonies were too remote and too prejudicial to be admitted where the other, more recent felony conviction was available. The State was assertedly unaware of the credit card conviction before Scott moved to have it admitted in lieu of the earlier convictions.

Scott sought and obtained permission to represent himself, both at the preliminary hearing in justice court, and then again at his arraignment and trial in district court. Scott unsuccessfully moved to disqualify the district court judge. Scott's motion to suppress the firearms was also denied. The matter proceeded to trial on February 25, 1992, and the jury returned a verdict of guilty the next day. The State thereafter filed a motion to amend the information to charge Scott as an habitual criminal. Scott's opposition to the motion proved unsuccessful, and he was thereafter found to be an habitual criminal and sentenced to sixteen years in the Nevada State Prison.

## DISCUSSION

*Whether the State's success in enhancing Scott's sentence pursuant to a post-verdict motion charging Scott as an habitual criminal invalidated Scott's waiver of his Sixth Amendment right to assistance of counsel*

Scott protests the enhancement of his sentence resulting from the State amending the information and charging him as an habitual criminal after he had been found guilty of being an ex-felon in possession of a firearm. Scott notes that this move by the State substantially increased his potential penalty[1] and contends that this rendered his pre-trial waiver of the right to assistance of counsel unintelligent, unknowing, and therefore invalid. We agree.

The United States Supreme Court has held that although a criminal defendant has a constitutional right to waive the right to counsel and represent himself, such a waiver must be knowing and intelligent. Faretta v. California, 422 U.S. 806 (1975). In order to assure compliance with the *Faretta* standard, this court

---

[1]NRS 202.360, the felon in possession statute, carries a penalty of from one to six years. NRS 207.010, the habitual criminal statute, carries a penalty of from ten to twenty years.

has required that the district court canvass a defendant who requests self-representation, and that such a canvass "must include an attempt to make the defendant aware of 'the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder . . . and all other facts essential to a broad understanding of the whole matter.'" Anderson v. State, 98 Nev. 539, 540-41, 654 P.2d 1026, 1027 (1982) (quoting Cohen v. State, 97 Nev. 166, 168, 625 P.2d 1170, 1171 (1981)).

NRS 207.010(5) allows habitual criminal charges to be brought after conviction of the primary offense. Nevertheless, the State must advise the district court that such charges will be filed in the event of a conviction in order to enable the court to fully apprise a defendant of the potential consequences of self-representation. Otherwise, the court will be unable to inform the defendant of the range of punishment he may actually face and will also be ill-equipped to provide the defendant with a broad understanding of the whole matter.

This is what occurred in the instant case. At no point during the preliminary hearing or pre-trial canvasses of the defendant was he informed that he might be facing an additional charge with a greater penalty after being found guilty of the weapons charge.[2] As the State itself concedes: "[A]t the time of the *Faretta* canvass, the judge was unaware that a habitual criminal allegation would be filed and could not have informed the Defendant of the possible subsequent enhancement." This rendered Scott's waiver of the right to counsel unknowing and unintelligent, and thus invalid under *Faretta*.

The State claims that it was not aware of both of Scott's prior felony convictions at the time that trial commenced. This lack of knowledge is difficult to understand or excuse since both judgments of conviction were entered in Clark County, Nevada. The district court also found the State's assertion suspect, noting that the sale of credit card conviction, of which the State was assertedly unaware, appeared "three or four different places [on the defendant's Scope Printout]" and that while an individual district attorney may not have learned about all of a defendant's prior convictions, the State at least had constructive notice thereof. In any event, the reason the court was not made aware of the possibility of habitual criminal enhancement prior to trial is irrelevant, as the effect is the same in any case.

---

[2]Indeed, a review of Scott's canvasses reveals that they did not specifically discuss the nature and potential penalties associated with the firearm charge, and thus may have been vulnerable to challenge under this court's prior rulings even if habitual criminal charges had not been pursued by the State.

The State also argues that Scott is a very sophisticated criminal who has represented himself before, and speculates that he would probably have represented himself even if he had been informed of the habitual criminal charges, and that he must surely have known of the full implications of going to trial, including the possibility of being sentenced as an habitual criminal. We are unwilling to substitute the State's speculation on what Scott may have done if he had been properly canvassed, for the type of actual canvass Scott was entitled to receive under this court's rulings on the subject. The post-conviction filing of habitual criminal charges rendered the pre-trial canvasses invalid as a basis for allowing self-representation.

For reasons previously discussed, Scott's conviction and sentence must be reversed and vacated, respectively, and the matter remanded for a new trial. If Scott again elects to represent himself, the district court will be in a position to assure that he is fully canvassed before self-representation may be allowed.

## Fourth Amendment issues

Despite our determination that a new trial is required, we elect to consider Scott's Fourth Amendment issues as a means of eliminating uncertainty upon retrial. Scott contends that the firearms and ammunition introduced against him at trial represents the inadmissible fruits of a Fourth Amendment violation that required their suppression. We disagree.

## The search of the vehicle was valid

Scott asserts that the search of the vehicle was invalid under the Fourth Amendment and that the weapons retrieved from the vehicle should therefore have been excluded. However, Scott lacks standing to challenge the validity of the vehicular search and this issue may be disposed of on that basis alone. As one commentator has explained:

> In *Rakas v. Illinois,* [439 U.S. 128, (1978),] the Supreme Court made it clear that passengers do not have standing to object to the search of a car simply because of their presence in it. Instead, the question is whether or not the police activity infringed upon a reasonable expectation of privacy. This privacy analysis is compounded by the Court's conclusion that cars have a lesser expectation of privacy than houses.
>
> The question most often asked in these cases, then, is who besides the owner of the car has standing to object to its

search. It seems that family members would. Although owners will ordinarily have standing, non-owner passengers will rarely have standing to challenge the search of the car. . . . On the other hand, courts have found standing in cases where the non-owner driver or passenger can show lawful possession of the car. The person may have rented the vehicle, borrowed it, or been given permission to use it on either a short or long term basis.

1 John Wesley Hall, Jr., *Search and Seizure* § 6:10 (2nd ed. 1991).

Scott has failed to show or even assert that he fits into that rare case in which a non-owner passenger may have standing to contest the search of a vehicle by showing some possessory interest in the vehicle. Instead, Scott misapprehends the standing principle and argues that the State may not assert a lack of standing since the State itself charged him with a possessory interest in a weapon retrieved from the vehicle. However, for purposes of standing to contest the validity of a vehicle search, it is the possessory or ownership interest in the vehicle, not the items seized therefrom, which is relevant.

On the other hand, "[o]ccupants of a car have standing when they assert a violation of their own Fourth Amendment interests independent of the owner's privacy, such as the initial stop. Defendants are able to object to the search or seizure of their persons. A stop is a seizure." Wesley, *supra* at § 6:10. Thus, one of Scott's contentions regarding the invalidity of the search is reviewable herein: namely, that the officer's stop of the vehicle was a mere pretext to conduct an unreasonable search.

Although this claim of error is reviewable, it must be rejected. Officer Densley testified at the preliminary hearing and at trial that the stop was made pursuant to a suspicion that the vehicle was stolen. This constituted a manifestly reasonable ground for stopping the car. *See, e.g.,* Stuart v. State, 94 Nev. 721, 587 P.2d 33 (1978) (officer who observed missing trunk lock on vehicle and thus inferred that vehicle might be stolen acted reasonably in stopping vehicle for investigation).

[Headnote 6]

Scott asserts that this was not the true reason the vehicle was stopped, noting that no citation issued for the improperly affixed, improper license plate. This does not negate the reasonableness

of the stop since Officer Densley had no means of determining whether the improper license indicated a stolen vehicle without questioning the occupants of the car. Officer Densley explained that the traffic violations were disregarded when everyone in the vehicle was ultimately arrested for felony offenses. Scott's position is without merit.

### The search of Scott's person was valid

Scott contends that Officer Densley's search of his person, which produced the three 12-gauge shotgun shells, was unreasonable and exceeded the scope of a search allowed by Terry v. Ohio, 392 U.S. 1 (1968). Scott's argument is primarily based upon the nature of the objects felt and retrieved by the officer, which were round shotgun shells rather than a weapon such as a gun or knife. The State counters that the search by which the shells were found did not constitute a *Terry* "stop and frisk," but rather a search occurring subsequent to Scott's custodial arrest that was proper as a search incident to arrest under United States v. Robinson, 414 U.S. 218 (1973).

*Terry v. Ohio* recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Terry* 392 U.S. at 22. Furthermore, during the course of such an investigatory stop, the officer is permitted to make "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27. Thus, *Terry* allows an investigatory stop by a police officer who has observed suspicious behavior, and further allows the officer to conduct a precautionary frisk of the individual stopped, if the circumstances indicate a reasonable belief that the individual may be armed. If something which might be a weapon is discovered during the course of the pat-down of the suspect's outer clothing, the officer may further protect himself by reaching into pockets or under the outer surface of the suspect's garments to retrieve the weapon. *Id.* at 29-30.

*United States v. Robinson,* on the other hand, permits a more complete and intrusive search of a person than that allowed by *Terry,* but only when the search is performed incident to the lawful custodial arrest of the individual being searched. *Robinson,* 414 U.S. at 224-29.

Although neither of the parties' briefs provides full enlightenment concerning the circumstances surrounding the search of Scott's person, our review of the record reveals a somewhat hybrid case that appears to be closer to a *Terry* stop and frisk situation, at least as perceived by the officer. Specifically, Officer Densley testified as follows at preliminary hearing:

> Q. All right. Let me ask you. At the time that you pa[t] searched these subjects, were they under arrest?
>
> A. No, they were not under arrest at that time. They were placed in handcuffs after the officer that came up to the car and found a loaded [.]38 caliber weapon.
>
> . . . .
>
> Q. . . . . I asked you earlier were these suspects in custody at the time that you conducted this pat search, and I believe that you answered that they weren't. All right.
>
> . . . .
>
> A. Oh, Okay. What I stated is that the subjects were not under arrest. They were in handcuffs due to the fact that we found a loaded firearm. I did conduct a pa[t] down search, and I felt some shotgun shells in the pocket and I did remove them.

At trial, Densley testified as follows:

> Q. And when Officer Finley arrived he discovered the .38 in the front of the car?
>
> A. That is correct.
>
> Q. And then it was after that that you then began to further question the suspect and pat him for weapons?
>
> A. Yes.
>
> Q. Would that be normal police procedure when you found a weapon in the car to do that?
>
> A. Yes.
>
> Q. I believe you stated also it's normal police procedure just to remove the items you believe are possible weapons?
>
> A. That is correct, yes.
>
> Q. Also it's your testimony you did remove from the defendant from his pocket 12-gauge shotgun shells?
>
> A. That is correct.

Thus, it appears that Scott was placed in handcuffs and pat searched following the retrieval of the first firearm from the vehicle. Officer Densley only removed those items he believed to be weapons, apparently including ammunition within that category. The search which retrieved the shotgun shells was closer to a *Terry* stop and frisk than a *Robinson* search incident to a lawful

arrest. However, the search was justified and reasonable under *Terry,* and Scott's assertion that the search went beyond the scope of *Terry* is without merit.

The initial stop was justified under *Terry* in order to investigate a suspicious situation. The handcuffing and pat-down for weapons was also permissible under *Terry* as a reasonable precaution to protect the officer's safety after investigation revealed the presence of loaded weapons in the automobile, thus leading to a reasonable inference that the occupants of the vehicle might be armed as well. As a result of the justified stop and frisk, the officer conducting the frisk felt shotgun shells in the suspect's pocket. It is reasonable for an officer, as a precautionary measure, to retrieve and separate from a suspect during the course of a *Terry* stop and frisk, either weapons or ammunition or both. *See, e.g.,* United States v. Ward, 23 F.3d 1303 (8th Cir. 1994) (affirming conviction for being an ex-felon in possession of a firearm and noting that "[t]he nature and scope of the search present no problems under *Terry* and its progeny. [The officer] merely frisked Ward's outer clothing until he felt the cylindrical objects in Ward's pocket. Believing that the objects were shotgun shells, he was justified in reaching into the pocket to retrieve them[]"); State v. Smith, 665 P.2d 995, 998 (Ariz. 1983) (shotgun shells taken from suspect's pocket during justified *Terry* frisk were properly admitted in subsequent murder prosecution); People v. Lewis, 507 N.Y.S.2d 80, 81 (App. Div. 1986) (ammunition recovered during frisk undertaken because officer had reasonable basis to believe the defendant might be armed was properly admitted into evidence at trial), *appeal denied,* 506 N.E.2d 548 (1987); State v. Moton, 733 S.W.2d 449, 451 (Mo. Ct. App. 1986) (where pat-down search of suspect held reasonable to protect officer's safety, admission of thirteen .32 caliber bullets recovered by said search was also proper).

We conclude that Scott's remaining issues are rendered moot by our opinion or are otherwise without merit.

## CONCLUSION

For the reasons explained above, we reverse the judgment of conviction entered below, vacate the sentence imposed, and remand this matter for a new trial in accordance with this opinion.