*920
 
 OPINION
 

 Per Curiam:
 

 SUMMARY
 

 On the night of July 5,
 
 1996,
 
 Bruce Charles Weinstein (“Weinstein”), an illegal bookmaker, disappeared from his Las Vegas home. Suspicious of the circumstances surrounding Weinstein’s disappearance, his family hired a private investigator, Michael R. Wysocki (“Wysocki”), to determine what happened to Weinstein. Wysocki’s investigative efforts focused on Weinstein’s live-in love interest, Amy Rica DeChant (“DeChant”). After a week of investigation, Wysocki reported what he had learned to the police. The police then began an official investigation and interviewed DeChant. In a videotaped statement to the police, DeChant recounted that Weinstein was murdered by masked intruders who told her to clean up the evidence and to remain silent. DeChant inferred that Weinstein was killed by individuals connected with organized crime (“mob”) activities. Eventually, DeChant and one of her employees, Robert Wayne Jones (“Jones”), were indicted for the murder and robbery of Weinstein. During trial, over DeChant’s objections, the State introduced testimony from a veteran police officer that DeChant’s statements about Weinstein being the victim of a mob hit were not credible. This testimony was emphasized by the State during closing arguments. DeChant also attempted to subpoena Wysocki’s investigative notes, but her request was denied by the district court, which concluded that the notes were privileged under Nevada law.
 

 We conclude that the officer’s testimony and the State’s reference to the testimony in the State’s closing argument impermissi-bly commented on the veracity of DeChant’s statement. Moreover, the district court erred in concluding that Wysocki’s notes were privileged. Because of the effect of these errors, we reverse and remand for a new trial.
 

 FACTS
 

 In the fall of 1995, DeChant, an operator of a successful carpet cleaning business, became romantically involved with Weinstein, an illegal bookmaker working in Las Vegas. DeChant eventually lived with Weinstein at his new home.
 

 The following summer, the two planned a vacation for the week after the Fourth of July. On July 5, 1996, two days before the trip was to begin, Weinstein disappeared from his home. Weinstein’s
 
 *921
 
 neighbor, Yohan Lowie (“Lowie”), testified that at 10:00 p.m. that evening, he heard three popping sounds, which he thought were fireworks left over from the Fourth of July.
 

 The next morning, Weinstein’s friends and family became alarmed when Weinstein failed to follow his normal practice of calling in to work. Silvia White, Weinstein’s mother, went over to Weinstein’s house in the early afternoon. Inside, she noticed that an area of the carpet was wet, smelled strongly of vinegar, and was surrounded by brown spots. When White spoke with DeChant, DeChant told her that Weinstein had left the night before with instructions that if he was not back before the vacation began, she was to leave without him and he would meet her later.
 

 The next day, July 7, 1996, White and a family friend agreed to hire a private investigator, Wysocki, to help determine what happened to Weinstein. In the initial days of Wysocki’s investigation, he focused his efforts on DeChant because several of Weinstein’s acquaintances suspected DeChant. At trial, Wysocki testified that when he first asked DeChant about the night of the disappearance, she maintained her story that Weinstein had told her that he was going out and would meet her on vacation if he did not come back in time.
 

 Then on Thursday, July 11, 1996, when DeChant spoke with Wysocki again, Wysocki testified that DeChant told him that she was planning to leave the country and that she had done research about which countries would not extradite her. However, on cross-examination, Wysocki was unsure of whether he or DeChant first brought up the topic of extradition.
 

 On Friday, July 12, 1996, DeChant had another conversation with Wysocki, and Wysocki testified that DeChant told him a new version of the events surrounding Weinstein’s disappearance. According to Wysocki, DeChant said that she was at home the night of July 5th when four masked intruders came in, took Weinstein upstairs, beat him up, shot him, and then took his body out of the house. The intruders then told DeChant, whom they had put in a downstairs room during the shooting, to clean up the mess and that if anyone ever asked her what happened, she should tell them that Weinstein had gone out but did not say where he was going. These intruders also told DeChant that they were watching her and would kill her if they found out that she had told anyone what really happened.
 

 The next day, DeChant gave a taped interview to homicide detectives where she repeated her story about the masked intruders. In this interview, DeChant also stated that she had received a call from the intruders several days after the murder reminding
 
 *922
 
 DeChant that they were watching her. Because of Weinstein’s illegal bookmaking activities, DeChant’s statement implied that Weinstein was killed by organized crime figures,
 
 i.e.,
 
 “the mob.”
 

 Homicide detectives now began an exhaustive search of Weinstein’s Las Vegas home, DeChant’s car, Weinstein’s car, and the truck DeChant used for the cleaning business. The police also investigated the relationship between DeChant and her employee Jones, and the possible involvement of Jones in Weinstein’s disappearance. The investigation uncovered a blood trail from the master bedroom, down the stairs, and into the foyer area. However, no murder weapon, shell casings, or bullet holes were ever found at the scene. Further, no blood stains or carpet fibers were found in any of the vehicles. Finally, detectives searched a safety deposit box that DeChant had opened at a Las Vegas hotel where they found $35,000.00 in sports book chips and a bag of jewelry.
 

 In August of 1996, Weinstein’s body was found in a remote area outside of Las Vegas. A .38 caliber bullet was found inside the body and determined to be the cause of death, but ballistic tests could not be performed because of the condition of the bullet. Later, a .38 caliber gun was found in a desert area outside of Vegas that was traced to Mathew Hunt (“Hunt”), a friend of Jones’s son. Hunt testified that he had traded the gun to Jones’s son.
 

 On September 12, 1997, DeChant and Jones were both indicted for conspiracy to commit robbery and/or murder, murder with the use of a deadly weapon, robbery with the use of a deadly weapon, and accessory to murder.
 

 Prior to trial, a hearing was held concerning DeChant’s subpoena duces tecum for Wysocki’s notes and billing records regarding his investigation. In that hearing, the State took no position. Instead Wysocki was represented by independent counsel who argued that Wysocki was not permitted to divulge the information. Wysocki’s argument was based on NRS 648.200, which forbids private investigators from divulging information acquired, except at the request of the client or as “required by law.” The district court concluded that the statute created a privilege that Wysocki could invoke, and thus the district court did not have the discretion to order the disclosure of Wysocki’s raw notes.
 

 At trial, Wysocki claimed that all the information he had in his notes was included in a ninety-eight-page report that was prepared after a police interview. Further, Wysocki stated that if he had had anything to add to the report, he would have just informed the police verbally without preparing any additional writings.
 

 During trial, the State sought to introduce the testimony of Alfred Leavitt (“Leavitt”), a former Las Vegas Metropolitan
 
 *923
 
 Police Department detective with thirty years of experience in investigating homicides, including some involving organized crime. The State had previously asked Leavitt to review DeChant’s videotaped police statement, which was shown at trial, and to form an opinion as to whether DeChant’s statements regarding a mob hit were credible.
 

 DeChant objected to Leavitt’s testimony on the grounds that it impermissibly commented on the veracity of DeChant’s statement. At a hearing outside the presence of the jury, the State acknowledged that it was not introducing Leavitt as an expert witness on the characteristics of organized crime murders. Instead, the State indicated that it wanted to draw on Leavitt’s personal experiences with organized crime murders to support Leavitt’s opinions about the credibility of DeChant’s statements. The State argued that:
 

 Based on that experience and that included some 30 years as a police, officer and hundreds of such investigations, he examined the statement given by Ms. DeChant to the police and pointed out several particulars in which her version of what happened was not credible as involving a mob hit... .
 

 The district court denied the objection and permitted Leavitt’s testimony.
 

 At trial, Leavitt testified that he had reviewed and evaluated DeChant’s statement and found several inconsistencies. First, Leavitt highlighted DeChant’s claim that the “mob” committed the crime while DeChant was at home and commented that when the “mob” killed somebody they did not leave witnesses. Leavitt explained that if this were a “mob hit,” the “mob” would have waited for Weinstein to be alone or would have killed DeChant as well. Further, after reiterating DeChant’s claim that the “mob” contacted her later, Leavitt testified that he had never experienced a case where the “mob” would call a witness to remind her that she was being watched. Leavitt also testified that DeChant’s claim that Weinstein’s body was removed from the scene was inconsistent with his experience because the “mob” would have left the body. Finally, Leavitt commented generally that nothing about DeChant’s statement fit with his experience.
 

 In addition, although the district court instructed Leavitt not to give his personal opinions as to the veracity of DeChant’s statement, Leavitt commented that DeChant’s story was a “fairy tale” and that he did not believe it for one second. Leavitt further stated that he did not believe that portion of DeChant’s statement claiming that she received a phone call from the intruders.
 

 The district court sustained DeChant’s objection to these statements and ordered some of the testimony stricken. The district
 
 *924
 
 court also instructed the jury to disregard Leavitt’s opinions about DeChant’s veracity. However, during closing argument, the prosecutor repeated Leavitt’s description of DeChant’s story as a “fairy tale,” and used Leavitt’s testimony as a basis for inferring that DeChant was a liar.
 

 At the conclusion of the trial, DeChant was convicted and sentenced for first-degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon.
 

 DISCUSSION
 

 Leavitt’s testimony and the prosecutor’s comments regarding DeChant’s veracity
 

 DeChant first contends that the district court erred in allowing Leavitt to testify at trial because his testimony impermissibly stated an opinion concerning DeChant’s truthfulness and the State improperly used it to infer DeChant’s guilt.
 
 [1]
 
 We agree that this testimony and the prosecutor’s comments during closing, constituted an impermissible comment on the veracity of DeChant’s statement.
 

 Initially, we note that there is some dispute with respect to whether Leavitt’s testimony was expert or lay opinion. The record reveals that the district court allowed Leavitt’s testimony as lay opinion, despite the fact that the testimony essentially consisted of specialized knowledge obtained through experience as a police detective. Accordingly, we will treat Leavitt as a lay witness.
 
 See
 
 Johnson v. Egtedar, 112 Nev. 428, 436, 915 P.2d 271, 276 (1996) (“The scope of a witness’ testimony and whether a witness will be permitted to testify as an expert witness are within the discretion of the trial court, and the trial court’s ruling will not be disturbed unless there is an abuse of discretion.”).
 

 In general, “it is exclusively within the province of the trier of fact to weigh evidence and pass on the credibility of witnesses and their testimony.” Lay v. State, 110 Nev. 1189, 1192, 886 P.2d 448, 450 (1994). Thus, a lay witness’s opinion concerning the veracity of the statement of another is inadmissible.
 
 See
 
 Sterling v. State, 108 Nev. 391, 397, 834 P.2d 400, 404 (1992) (“Lay opinion about the veracity of particular statements by another is
 
 *925
 
 inadmissible on that issue.”) (quoting People v. Melton, 750 P.2d 741, 758 (Cal. 1988)).
 
 [2]
 

 In this case, the State did not question Leavitt solely about his experience with organized crime murders and then have him testify, based upon that experience, that mob contract murders have particular characteristics. In fact, the State conceded it was not proposing to qualify Leavitt as an expert for that purpose. Instead, the State asked Leavitt to review DeChant’s statement and to form “an opinion as to whether or not Ms. DeChant’s story of a mob hit was credible.”
 
 [3]
 

 Leavitt’s testimony about his experiences with organized crime continuously referenced DeChant’s contrary claims and had the ultimate effect of impermissibly attacking the veracity of DeChant’s statement and the heart of her defense. Moreover, Leavitt made several comments directly stating his opinion of DeChant’s statement. For instance, Leavitt commented that DeChant’s claim that the mob committed the murder with DeChant at home was a “fairy tale” and that he did not believe it for a second. Further, when asked about DeChant’s claim that she was later contacted by a mob individual warning her to keep silent, Leavitt stated, “I don’t believe that either.”
 

 Finally, the prosecutor adopted Leavitt’s language during closing argument and concluded that DeChant’s story was “a fairy tale that was made up in her mind.” Additionally, there were several other instances during the State’s closing argument when the prosecutor argued that DeChant’s story was a “sham” based upon the Leavitt testimony. The prosecution’s combined comments served to highlight and re-emphasize Leavitt’s opinion of
 
 *926
 
 DeChant’s credibility, undermining the curative effect of the limiting instruction.
 

 We conclude that the district court erred in permitting Leavitt’s testimony. Moreover, given the crucial nature of Leavitt’s testimony and the prosecutor’s paraphrasing of Leavitt’s opinion during closing, we cannot say that the error was harmless.
 

 The district court’s quashing of DeChant’s subpoena duces tecum requesting Wysocki’s notes
 

 DeChant further contends that the district court erred when it held that it did not have discretion to compel disclosure of Wysocki’s notes that he prepared during the initial days of his investigation. Specifically, DeChant argues that the district court misconstrued NRS 648.200, which the district court concluded created a privilege in private investigators that prevented it from ordering Wysocki to disclose his notes.
 

 In relevant part, NRS 648.200 states:
 

 It is unlawful for any licensee or any employee, security guard, officer or member of any licensee:
 

 1. To divulge to anyone,
 
 except as he may be so required by law to do,
 
 any information acquired by him except at the direction of the employer or client for whom the information was obtained.
 

 (Emphasis added.)
 

 Although we have not previously interpreted the scope of NRS 648.200, two other states have dealt with identical statutes.
 
 See
 
 Attorney General v. Pelletier, 134 N.E. 407, 418 (Mass. 1922); People v. Roach, 109 N.E. 618, 624 (N.Y. 1915). Both
 
 Pelletier
 
 and
 
 Roach
 
 conclude that such a statute affords no privilege to an investigator or employee summoned as a witness in court to give testimony as to facts concerning an issue under investigation. Further, the Massachusetts court noted that “[t]he statute was not intended to hamper the administration of justice but simply to provide for the licensing and regulation of private detectives and to protect them . . . from faithless employees.”
 
 Pelletier,
 
 134 N.E. at 418-19.
 

 We conclude that the “except as he may be so required by law to do” language of the statute and the compelling reasoning in
 
 Pelletier
 
 and
 
 Roach
 
 indicate that a district court does have discretion to compel disclosure of documents in possession of a private investigator that are relevant to trial and not covered by any
 
 *927
 
 other privilege. Accordingly, the district court erred in quashing DeChant’s subpoena duces tecum based upon the provisions of NRS 648.200.
 

 Whether the cumulative error was prejudicial
 

 Although we have concluded that the admission of Leavitt’s testimony alone would warrant reversal, we have also analyzed the cumulative effect of the errors at trial.
 

 We have stated that if the cumulative effect of errors committed at trial denies the appellant his right to a fair trial, this court will reverse the conviction.
 
 See
 
 Big Pond v. State, 101 Nev. 1, 3, 692 P.2d 1288, 1289 (1985). Relevant factors to consider in deciding whether error is harmless or prejudicial include whether “the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged.’ ’
 
 Id.
 

 In this case, we first note that the evidence was largely circumstantial, with inferences of guilt being drawn principally from DeChant’s actions after Weinstein’s murder. We also note the gravity of the first-degree murder and robbery charges upon which DeChant was convicted.
 

 More importantly, Leavitt’s testimony was extremely prejudicial as it directly undermined DeChant’s version of facts and was stated by a witness whom the State portrayed as a highly experienced person with specialized knowledge. Finally, Leavitt’s expertise, and his opinions about DeChant’s credibility, were impermissibly referenced by the prosecution during closing argument.
 

 Further, we conclude that the district court’s error in not compelling disclosure of Wysocki’s investigative notes was also of a prejudicial nature as Wysocki was a critical witness for the State regarding DeChant’s conduct during the first week of Weinstein’s disappearance. Thus, his notes were relevant to an effective cross-examination by DeChant. Although Wysocki testified that all his notes were reduced to the ninety-eight-page police report, he also testified to his lucrative financial arrangement and increasingly close relationship with the Weinsteins. DeChant cannot be required to rely upon Wysocki’s statements in this regard.
 

 We conclude that even if the admission of Leavitt’s testimony could be considered harmless error, the cumulative effect of the errors at trial denied DeChant her right to a fair trial and mandates reversal.
 

 
 *928
 

 CONCLUSION
 

 We first conclude that Leavitt’s testimony regarding the veracity of DeChant’s story and the State’s comments during closing argument were reversible error. Next, we conclude that the district court erred in its interpretation of NRS 648.200, which prevented DeChant from obtaining Wysocki’s investigative notes. Although the district court’s admission of Leavitt’s testimony was reversible error, we also conclude that the cumulative effect of the errors at trial was prejudicial. Therefore, we reverse and remand the case to the district court for a new trial.
 
 [4]
 

 [1]
 

 DeChant also contends that the district court erred in denying her motion to sever and that there was insufficient evidence to support her convictions. Because we reverse this matter on other grounds, we need not reach DeChant’s contention respecting the motion to sever. We further conclude, however, that sufficient evidence was presented to establish guilt beyond a reasonable doubt as determined by a rational trier of fact.
 

 [2]
 

 Initially, the State argues that this case law does not apply because it involves only opinions regarding another witness’s
 
 testimony.
 
 Thus, the State claims that because DeChant never took the stand and Leavitt offered an opinion only of her out-of-court statement, which was introduced at trial, the case law should not apply. However, we conclude that this “testimony” versus “statement” distinction is, in this case, a distinction without a difference. As noted above, the underlying purpose for the inadmissibility of opinion evidence regarding the truthfulness of another’s statement is to prevent a witness from invading the jury’s function of being the sole authority in weighing the evidence and determining the ultimate facts in a case.
 
 See
 
 Townsend v. State, 103 Nev. 113, 117, 734 P.2d 705, 709 (1987) (it is the prerogative of the jury to make unassisted factual determinations). This purpose is equally important where the offending witness comments on the credibility of a defendant’s statement, which embodies the defendant’s version of facts. Therefore, we conclude the State’s argument lacks merit.
 

 [3]
 

 We note that even if Leavitt were qualified as an expert, our conclusion would not change as similar testimonial boundaries exist for experts.
 
 See
 
 Lickey v. State, 108 Nev. 191, 196, 827 P.2d 824, 827 (1992) (“An expert may not comment on the veracity of a witness.”) (citing Townsend v. State, 103 Nev. 113, 118-19, 734 P.2d 705, 708-09 (1987)).
 

 [4]
 

 Nothing in this opinion is intended to prohibit the State from attempting to introduce testimony from an individual with expertise in the patterns, if any, surrounding organized crime murders. Assuming such testimony was properly admitted, the State would also be free to argue that DeChant’s version of the events does not follow the pattern of a mob contract murder.