ARTURO TORRES CORTES, APPELLANT, *v.*
THE STATE OF NEVADA, RESPONDENT.

No. 54747

July 21, 2011 260 P.3d 184

[Rehearing denied September 30, 2011]

*Philip J. Kohn*, Public Defender, and *Sharon G. Dickinson*, Deputy Public Defender, Clark County, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *David J. Roger*, District Attorney, *Steven S. Owens*, Chief Deputy District Attorney, and *Carrie Morton*, Deputy District Attorney, Clark County, for Respondent.

Before Douglas, C.J., Pickering and Hardesty, JJ.

## OPINION

By the Court, Pickering, J.:

During a routine traffic stop, the police developed what the district court found was a reasonable suspicion that the car's passenger, appellant Arturo Torres Cortes, was armed and dangerous. The police ordered Cortes out of the car and subjected him to a patdown search, which produced the evidence underlying the conviction for possession of a controlled substance (methamphetamine) he now appeals. Under *Arizona v. Johnson*, 555 U.S. 323 (2009), if the finding of reasonable suspicion is sound, no Fourth Amendment violation occurred. On appeal, Cortes urges us to reject the district court's finding of reasonable suspicion or to interpret the Nevada constitutional guarantee against unreasonable searches and seizures more strictly than the Supreme Court interpreted the Fourth Amendment in *Johnson*. Finding no basis for doing so, we affirm.

### I.

Cortes was riding in the front passenger seat of a car that North Las Vegas Patrol Officer Arrendale stopped for not having a license plate or temporary tag. It was dark and Arrendale was alone. As Arrendale approached, he shone his flashlight into the car and saw two occupants, the driver and Cortes, neither of whom was wearing a seatbelt.

Officer Kimberly Wadsworth arrived as back-up shortly after Arrendale initiated the traffic stop. When she arrived, she walked to the passenger side of the car while Arrendale addressed the driver. Both the driver and Cortes seemed agitated to Wadsworth, and she saw a tool-knife on Cortes's lap,[1] which she told him to put out of reach on the floor. Although Wadsworth asked Cortes to keep his hands visible, he did not comply.

---

[1]Officers Arrendale and Wadsworth described the knife as a Gerber- or Swiss Army-type knife, with tools that fold out. The knife was not recovered from Cortes's person or in a later inventory search of the car.

Arrendale asked the driver for her license and the car's registration and insurance; he asked Cortes for identification so he could issue him a citation for the seatbelt violation. Cortes first said that he had identification, then said he didn't. The driver produced her driver's license and temporary registration for the car. The temporary registration was in a third person's name and the driver had no proof of insurance.

Wadsworth alerted Arrendale to the tool-knife on the floor. Arrendale asked the driver to get out of the car, separating her from Cortes. The officers switched places so that Wadsworth, a female, could address the female driver. When Arrendale crossed to the passenger side, he saw Cortes reach toward a blue denim bag on the floor. By then, Cortes had been told several times to keep his hands in his lap where they could be seen. Cortes's conflicting answers about his identification concerned Arrendale because he "didn't know who Mr. [Cortes] was [or] what he was capable of." He also "didn't know what was in the [denim] bag or if he was trying to retrieve a weapon out of the bag." These facts, combined with the pair's unusual agitation, led Arrendale to order Cortes out of the car. Cortes protested, demanding to know "Why?" and "What for?"

To Arrendale's mind, when Cortes got out of the car, he did so furtively, pressing his back against the doorjamb and keeping his hands behind him. After several requests from Arrendale, Cortes turned and faced the vehicle. He resisted Arrendale's attempts to conduct a patdown search, so Arrendale handcuffed him. With Cortes fighting him and yelling, Arrendale forced Cortes away from Wadsworth and the driver to the rear of his patrol car. On reaching the patrol car, Arrendale resumed his patdown search of Cortes and felt what he recognized as a methamphetamine pipe. Cortes continued to struggle, shoving Arrendale. Arrendale took him down to the ground and called for Wadsworth's help. Together, they placed Cortes under arrest for obstructing an officer. In the search incident to arrest that followed, the officers discovered, in addition to the pipe, four bags containing what proved to be 3.3 grams of methamphetamine and $528 in cash.

Eight days before trial, Cortes filed a motion to suppress the pipe and drug evidence as the fruits of an illegal search and seizure. He based the motion on the transcript of the preliminary hearing, where Arrendale testified and was cross-examined about the stop and frisk and Cortes's arrest. The motion was argued on the opening day of trial. Denying the motion, the district court made findings that both prongs of the test in *Arizona v. Johnson* were met, to wit: "the first prong . . . was met when the officer conducted [a] legitimate traffic stop because there was no license plate on the car"; and "the second prong was met based on Mr. Cortes'[s] behavior in reaching into the bag, his general demeanor, as well as the fact I think most significantly that he had a knife, so the police already knew that he was in possession of a weapon."

Based on this, "it was certainly reasonable for the police to be concerned that there may be additional weapons."

The jury convicted Cortes of possession of a controlled substance with intent to sell. He was sentenced to a suspended prison term of 18 to 48 months and placed on 5 years' probation.

## II.

Cortes contends that the district court should have granted his motion to suppress because the officers violated his right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and its Nevada counterpart, Nev. Const. art. 1, § 18. The district court correctly rejected Cortes's federal constitutional claim under *Arizona v. Johnson*. We also reject Cortes's argument that the Nevada Constitution grants broader protections against unreasonable searches and seizures in this context than does the Fourth Amendment.

## A.

We review de novo the district court's legal determination of the constitutionality of a frisk but review its findings of fact for clear error. *Somee v. State,* 124 Nev. 434, 441, 187 P.3d 152, 157-58 (2008). Cortes did not request an evidentiary hearing on his motion to suppress, which he filed just days before trial. Nonetheless, Cortes faults the district court for not sua sponte ordering an evidentiary hearing, citing *State v. Ruscetta*, 123 Nev. 299, 304, 163 P.3d 451, 455 (2007), and *Somee*, 124 Nev. at 441-42, 187 P.3d at 157-58; for reasons not broached in the district court, he urges us to discredit Arrendale's and Wadworth's testimony. But Cortes did not contest the evidence below that supports the district court's findings, and we cannot say they were clearly erroneous or plainly wrong. Cortes did not have a right to an evidentiary hearing based solely on filing a motion to suppress, and the district court did not abuse its discretion in failing sua sponte to order one, especially since the motion to suppress was filed fewer than 15 days before trial, *see* NRS 174.125(3)(a), (b); EDCR 3.20(a); *United States v. Wilson*, 895 F.2d 168, 173 (4th Cir. 1990) (focusing on untimeliness of request for voluntariness hearing in upholding trial court's refusal to hold a hearing), and neither asked for an evidentiary hearing nor identified the disputed issues of material fact that merited one, *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion [to suppress].").

We turn then to the legal question: the constitutionality of the stop and frisk. As the district court correctly held, *Arizona v. Johnson* controls the Fourth Amendment analysis. In *Johnson*,

"officers pulled over an automobile after a license plate check revealed that the vehicle's registration had been suspended for an insurance-related violation[,] . . . a civil infraction warranting a citation." 555 U.S. at 327. "While other officers dealt with the driver and front-seat passenger, Officer Trevizo put some questions to Johnson, [a passenger] in the back seat, then asked him to exit the vehicle and, when he did, Trevizo frisked Johnson because his appearance and comments suggested he might be armed, which proved to be the case." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.3, at 117 (4th ed. Supp. 2010). Assuming as the state court had that "Trevizo had reasonable suspicion that Johnson was armed and dangerous," a unanimous Supreme Court held that the traffic stop and Johnson's frisk did not offend the Fourth Amendment: "Officer Trevizo surely was not constitutionally required to give Johnson an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her." *Johnson*, 555 U.S. at 334 & n.2; *id.* at 330 (stressing that "traffic stops are 'especially fraught with danger to police officers'" (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983))).

*Johnson* applies the two-pronged stop and frisk test in *Terry v. Ohio*, 392 U.S. 1, 9, 22-23 (1968), to passengers detained, along with the driver, in a traffic-stop setting. The first prong of the *Johnson/Terry* test requires a lawful traffic stop:

> [I]n a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity.

*Johnson*, 555 U.S. at 327. The second prong requires reasonable suspicion that the person frisked may be armed and dangerous: "To justify a patdown of the driver or a passenger during a traffic stop, . . . just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Id.*

Fitting the first prong of *Johnson/Terry* to the passenger, as opposed to the driver, is awkward because "in a lawful traffic stop, '[t]here is probable cause to believe that the driver has committed a minor vehicular offense,' but 'there is no such reason to stop or detain the passengers.'" *Johnson*, 555 U.S. at 331 (second alteration in original) (quoting *Maryland v. Wilson*, 519 U.S. 408, 413 (1997)). Nonetheless, "the risk of a violent encounter in a traffic-

stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop' ''; a passenger's motivation '' 'to employ violence to prevent apprehension of such a crime . . . is every bit as great as that of the driver.' '' *Id.* (quoting *Wilson*, 519 U.S. at 414). Since '' 'as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle,' '' *id.* (quoting *Wilson*, 519 U.S. at 413-14), the passenger is deemed seized for *Terry* purposes ''just as the driver is, 'from the moment [a car stopped by the police comes] to a halt on the side of the road.' '' *Id.* (alteration in original) (quoting *Brendlin v. California*, 551 U.S. 249, 263 (2007)).

Cortes does not contest the lawfulness of the traffic stop for no license plate or visible temporary tag. Thus, the first prong of *Johnson/Terry* is met: Along with the driver, Cortes was legitimately seized for the duration of the traffic stop.

The second *Johnson/Terry* prong focuses on the justification for the frisk.[2] It asks whether an officer has a reasonable suspicion that the driver and any passengers may be armed and dangerous. This ''is a fact-specific inquiry that looks at the totality of the circumstances in light of common sense and practicality.'' *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011) (internal quotation omitted) (discussing *Johnson*). Reasonable suspicion is measured by an objective standard. *See Ashcroft v. al-Kidd*, 563 U.S. 731, ___ (2011).

In this case, the totality of the circumstances justified frisking Cortes to protect the officers from the threat they reasonably suspected he posed to their safety. When Wadsworth arrived, Cortes

---

[2]Mechanically, a traffic-stop frisk normally involves the intermediate step of the officer ordering the driver or passenger out of the car. *Johnson* does not build this step into its *Terry* analysis because two prior cases, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), and *Maryland v. Wilson*, 519 U.S. 408 (1997), hold that, having made a legitimate traffic stop, a police officer can, without more, order the driver ''to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures,'' *Mimms*, 434 U.S. at 111 n.6, a holding *Wilson* extends to passengers, 519 U.S. at 415. Justice Stevens dissented in both *Mimms* and *Wilson*. In his view something more than the fact of a legitimate traffic stop should be required to justify the additional intrusion of an officer ordering a driver or passenger out of the car. *Mimms*, 434 U.S. at 115-24 (Stevens, J., dissenting); *Wilson*, 519 U.S. at 415-16 (Stevens, J., dissenting) (criticizing the majority's rule as allowing an exit order where ''there is not even a scintilla of evidence of any potential risk to the police officer'' but, in terms significant to this case, noting: ''Though the question is not before us, I am satisfied that—under the rationale of *Terry v. Ohio*—if a police officer conducting a traffic stop has an articulable suspicion of possible danger, the officer may order passengers to exit the vehicle as a defensive tactic without running afoul of the Fourth Amendment.'' (citation omitted)).

had a knife in his lap; the presence of a knife in plain view in a lawfully stopped car contributes to reasonable suspicion that other weapons may be present, making the person armed and dangerous even if the knife is moved out of reach. *United States v. Vinton*, 594 F.3d 14, 20-21 (2010 D.C. Cir.).[3] Despite being repeatedly asked, Cortes refused to keep his hands in plain view. *See United States v. Soares*, 521 F.3d 117, 121 (1st Cir. 2008) (passenger's refusal to obey "repeated orders to remain still and keep his hands in [officer's] view" cited as part of the totality of circumstances justifying a patdown search). After stating he had identification, Cortes contradicted himself and said he didn't; "evasive responses to police questions can help support reasonable suspicion," as can "contradictory answers to simple questions." *Tinnie*, 629 F.3d at 752. Cortes and the driver appeared unusually nervous and agitated to Arrendale and Wadsworth, both experienced patrol officers. *Id.* ("Tinnie acted suspiciously by moving around nervously as the officers approached the car"). Finally, when Cortes got out of the car, he did so strangely, trying to conceal his hands and back from Arrendale. *See United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010) (upholding passenger frisk under *Johnson* based partly on furtive movements and the guarded way the passenger got out of the car). Given all this, common sense tells us that a reasonable officer confronting Cortes at night during a traffic stop could reasonably suspect that Cortes was armed and that a frisk was necessary to protect himself and his partner.

Cortes advances another Fourth Amendment argument, tied to Arrendale's request for identification. He contends that Nevada's seatbelt statute, NRS 484D.495, is unconstitutionally vague and overbroad if it allows an officer to cite a passenger for a seatbelt violation after the car is stopped on the side of the road when the officer did not observe the seatbelt violation while the vehicle was moving. According to Cortes, if NRS 484D.495 is unconstitutional in this respect, then Arrendale's request for identification pursuant to NRS 484A.730(1) constituted an illegal search, making everything that followed the fruit of that poisonous tree. This argument fails in several ways. To begin with, we are not as troubled as Cortes by the constitutionality of NRS 484D.495(2) as applied to the facts of his case. While Arrendale may not have seen Cortes

---

[3]Cortes's argument that the knife was not recovered and did not, from its description, qualify as a "deadly weapon" as defined in NRS 202.320 is without merit. " 'A *Terry* investigation . . . involves a police investigation at close range, when the officer remains particularly vulnerable . . . [and] must make a quick decision as to how to protect himself and others from possible danger.' . . . Officer [Arrendale] did not have time to perform a close inspection of [Cortes's] . . . knife to determine precisely how dangerous it was." *Vinton*, 594 F.3d at 21 (ellipses in original) (quoting *Long*, 463 U.S. at 1052).

without a seatbelt on before he stopped the car (remember, it was dark), he saw him without one right afterward, making it fair to infer that Cortes had not been wearing it moments earlier when the car was still moving. Even if our instincts are wrong, moreover, evidence seized in reliance on a statute later held to be unconstitutionally vague does not violate the Fourth Amendment or require suppression of the evidence. *See Michigan v. DeFillippo*, 443 U.S. 31, 39-40 (1979); *see also Davis v. United States*, 131 S. Ct. 2419, 2423-24 (2011) (holding that evidence obtained in search conducted in objectively reasonable reliance on binding appellate precedent is not subject to exclusionary rule).

More fundamentally, Cortes's argument proceeds from a faulty premise. Arrendale's request that Cortes identify himself did not constitute an additional seizure under the Fourth Amendment. *Compare Johnson*, 555 U.S. at 333 ("An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." (citing *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005), which holds: "mere police questioning does not constitute a seizure"; "[e]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification" (internal citations omitted))), *with Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 185 (2004) (" '[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.' " (alteration in original) (quoting *INS v. Delgado,* 466 U.S. 210, 216 (1984))).

Thus, although it appears Arrendale had an independent justification to ask for Cortes's identification, he did not need one "[s]o long as the request did not 'measurably extend the duration of the stop.' " *United States v. Fernandez,* 600 F.3d 56, 62 (1st Cir. 2010) (quoting *Johnson*, 555 U.S. at 333); *accord United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) ("because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well" (internal citation omitted)). Here, Cortes failed to show that Arrendale's request for identification measurably extended the duration of the stop.[4] *See also* 4 LaFave, *supra*, § 9.6, at 184 (under *Johnson*, "an

---

[4]Cortes also argues that the traffic stop had been completed before Arrendale frisked Cortes, making the evidence inadmissible. Cortes did not make this argument below and the record does not support it.

officer with reasonable suspicion the passenger was armed and dangerous would be under no obligation to terminate the passenger's seizure until a frisk could be conducted").[5]

## B.

Article 1, Section 18 of the Nevada Constitution uses almost the same words as the Fourth Amendment does to prohibit unreasonable searches and seizures.[6] Although lacking textual or historical support, Cortes argues that, as a matter of policy, we should read the Nevada Constitution as imposing a stricter test for traffic-stop frisks than *Arizona v. Johnson* does. While federal Fourth Amendment jurisprudence does not dictate how a state supreme court interprets cognate provisions of its state constitution, *Virginia v. Moore*, 553 U.S. 164, 171 (2008) ("States [are] free to impose higher standards on searches and seizures than required by the Federal Constitution." (citation and quotation omitted)); *Osburn v. State*, 118 Nev. 323, 326, 44 P.3d 523, 525 (2002) ("states are free to interpret their own constitutional provisions as providing greater protections than analogous federal provisions"), and we have in two instances imposed stricter standards under Article 1, Section 18 of the Nevada Constitution than the Fourth Amendment demands, *State v. Harnisch*, 114 Nev. 225, 228-29, 954 P.2d 1180, 1183 (1998) (warrant clause); *State v. Bayard*, 119 Nev. 241, 247, 71 P.3d 498, 502 (2003) (custodial arrest for a non-jailable offense), we do not find reason to adopt this divergent approach in the *Arizona v. Johnson* context.

As a threshold matter, Cortes does not identify a constitutional infirmity in *Arizona v. Johnson* or offer a preferable rule. *Johnson*'s application of *Terry* frisk principles to the traffic-stop setting makes legal and practical sense. It is true that the passenger may have done nothing to justify the stop, making it harder to justify seizing the passenger as distinct from the driver for the duration of the stop. Nonetheless, we agree with *Johnson* that the need for officer safety in a situation as volatile and fraught with risk as a traffic stop outweighs that intrusion where, as here, reasonable suspi-

---

[5]We acknowledge but reject Cortes's further argument that Arrendale's use of handcuffs to control the frisk offended the Fourth Amendment. *See* 4 LaFave, *supra*, § 9.6, at 188 ("An otherwise valid frisk is not objectionable because the suspect was first placed in handcuffs," though noting that handcuffing "is not always permissible" (citing *id.* § 9.2(d), at 190 n.107 (collecting illustrative cases))).

[6]The Nevada Constitution employs slightly different punctuation and capitalization conventions, reverses the phrase "search and seizure" to read "seizure and search," and gives both the singular and plural versions of the words "place," "persons," and "things" where the Fourth Amendment does not. It also changes "Warrants" to "warrant." *Compare* Nev. Const. art. 1, § 18 *with* U.S. Const. amend. IV. It is hard to ascribe substantive significance to these minor variations.

cion develops during the stop that the passenger may be armed and dangerous. Indeed, this court has already so held, albeit applying the Fourth Amendment rather than the Nevada Constitution. *See Scott v. State*, 110 Nev. 622, 630-31, 877 P.2d 503, 509 (1994) (upholding patdown search under *Terry v. Ohio* following a traffic stop for a license plate violation that turned up a weapon).[7]

Cortes's misgivings do not seem to stem so much from *Johnson* as the two cases that precede it, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), and *Maryland v. Wilson*, 519 U.S. 408 (1997). In *Mimms* and *Wilson* the Supreme Court held that, for officer safety reasons, a lawful traffic stop, in and of itself, justifies an order to the driver and passenger to get out of the car. *See supra* note 2. Most states that have considered the hard policy choices presented in *Mimms* and *Wilson* have endorsed their holdings. *See Com. v. Gonsalves*, 711 N.E.2d 108, 116, 124-30 App. (Mass. 1999) (Fried, J., dissenting) (cataloguing state law on exit orders in traffic stops). Their critics would require some showing of "danger before compelling a driver [or passenger] to leave his motor vehicle," *id.* at 111 ("reasonable suspicion"); *see Wilson*, 519 U.S. at 415 (Stevens, J., dissenting) ("I am satisfied that—under the rationale of *Terry v. Ohio*—if a police officer conducting a traffic stop has an articulable suspicion of possible danger, the officer may order passengers to exit the vehicle as a defensive tactic without running afoul of the Fourth Amendment." (citation omitted)); *State v. Mai*, 993 A.2d 1216, 1221 (N.J. 2010) (requiring an intermediate showing—more than required to legitimate the stop but less than *Terry* requires to frisk—of "specific and articulable facts that would warrant heightened caution to justify ordering [a passenger] to step out of a vehicle detained for a traffic violation" (quotation omitted)).

But this case does not require us to weigh in on *Mimms* and *Wilson*. While Cortes's guarded exit from the car contributed to the reasons for the frisk, Arrendale had reasonable suspicion of pos-

---

[7]This court has historically applied *Terry* to search and seizure challenges, *State v. Lisenbee*, 116 Nev. 1124, 1128-29, 13 P.3d 947, 950 (2000), including challenges involving traffic stops. *See State v. Rincon*, 122 Nev. 1170, 1173-75 & n.2, 147 P.3d 233, 235-37 & n.2 (2006) (addressing the Fourth Amendment and Article 1, Section 18 jointly in traffic-stop setting); *Walker v. State*, 113 Nev. 853, 865, 944 P.2d 762, 770 (1997) (applying the first prong of *Terry* in a traffic-stop setting). It has also long drawn on Fourth Amendment jurisprudence in interpreting Article 1, Section 18 of the Nevada Constitution. *See, e.g., Osburn v. State*, 118 Nev. 323, 44 P.3d 523 (2002) (aligning Article 1, Section 18 with Fourth Amendment cases on surveillance equipment); *Howe v. State*, 112 Nev. 458, 916 P.2d 153 (1996) (analyzing warrant exception for home search); *Dean v. Fogliani*, 81 Nev. 541, 407 P.2d 580 (1965) (applying *Jones v. United States*, 362 U.S. 257 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980), to Article 1, Section 18 search and seizure standing challenge).

sible danger before he asked Cortes to get out of the car. Thus, the exit order and frisk that followed not only complied with *Arizona v. Johnson*, but with even the staunchest critic's view of the rule that should have been adopted in *Mimms* and *Wilson*. Constitutional questions should not be decided "except when absolutely necessary to properly dispose of the particular case," *State v. Curler*, 26 Nev. 347, 354, 67 P. 1075, 1076 (1902), and we follow this rule here as to Cortes's effort to engage us on *Mimms* and *Wilson*.

Cortes next directs us to *State v. Harnisch*, 114 Nev. 225, 228-29, 954 P.2d 1180, 1183 (1998), and *State v. Bayard*, 119 Nev. 241, 247, 71 P.3d 498, 502 (2003), as support for his argument that Nevada should reject *Johnson* on state constitutional grounds. But neither case applies. *Harnisch* involves the Warrants Clause (in Nevada, "warrant clause," *see supra* note 6) and holds, in a departure from Fourth Amendment jurisprudence, *see California v. Carney*, 471 U.S. 386, 392 (1985), that "probable cause and exigent circumstances are both necessary to validate a warrantless automobile search." *Harnisch*, 114 Nev. at 228, 954 P.2d at 1182-83. *Bayard* grows out of a single, deeply divided Supreme Court decision, *Atwater v. Lago Vista*, 532 U.S. 318, 354-55 (2001), that found no Fourth Amendment violation in a custodial arrest provoked by nothing more than a non-jailable seatbelt offense. Citing the discretionary arrest provision of NRS 484.795 (renumbered NRS 484A.730)—which provides an officer with discretion to arrest for citable traffic violations—*Bayard* holds both as a matter of state statutory and constitutional law, Nev. Const. art. 1, §.18, that the exercise of discretion to effect a custodial arrest for a non-jailable offense must be reasonable. 119. Nev. at 247, 71 P.3d at 502. The extent to which *Bayard* is statutorily based was demonstrated a year later in *Morgan v. State*, 120 Nev. 219, 88 P.3d 837 (2004), where a custodial arrest for a non-jailable offense was upheld because authorized by NRS 484.795(1) (now NRS 484A.730(1)) (providing for arrest for a minor traffic offense when "the person does not furnish satisfactory evidence of identity" or there are "reasonable and probable grounds to believe the person" will not appear in court).

The departures from Fourth Amendment law in *Harnisch* and *Bayard* do not justify rejecting *Johnson*'s application of *Terry* to traffic-stop frisks. Neither case involved the emergency police-safety concerns that underlie *Terry*. *Terry*'s two-prong test reflects a constitutional analysis premised on "swift [police] action" based on "on-the-spot" observations that, for practical reasons, cannot be subject to the traditional warrant procedure. *Terry*, 392 U.S. at 20. In *Harnisch*, the police conduct at issue was subject to analysis under the Warrant Clause of the Fourth Amendment and Article 1, Section 18 of the Nevada Constitution while *Terry* and, by

extension, *Johnson*, interpret the ''general proscription against unreasonable searches and seizures,'' preceding the Warrant Clause. *Terry*, 392 U.S. at 20. *Bayard* involved a custodial arrest, not *Terry* principles, and a unique combination of statutory and constitutional analysis not applicable here. Thus, our singular interpretation of Nevada Constitution Article 1, Section 18 in *Harnisch* and *Bayard* has no bearing in the *Johnson/Terry* setting.

## C.

Cortes's remaining claims of testimonial, evidentiary, and instructional errors fail. The district court did not abuse its considerable discretion in recognizing Arrendale's testimony as permissible lay opinion, *DeChant v. State*, 116 Nev. 918, 924, 10 P.3d 108, 112 (2000), nor do we discern any comment by him suggesting that Cortes had a prior criminal history, *see Manning v. Warden*, 99 Nev. 82, 86, 659 P.2d 847, 849-50 (1983). Cortes did not object to the assertedly improper comment on his right to remain silent, and plain error does not appear given that Cortes waived his right to remain silent, *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010), and did not clearly reinvoke this right. *See United States v. Pino-Noriega*, 189 F.3d 1089, 1098 (9th Cir. 1999). And the foundation laid by the State as to the chain of custody of the physical evidence satisfied *Burns v. Sheriff*, 92 Nev. 533, 534-35, 554 P.2d 257, 258 (1976); Cortes's objections go to the weight, not the admissibility, of this evidence. *See Hughes v. State*, 116 Nev. 975, 981, 12 P.3d 948, 952 (2000). Finally, the errors Cortes asserts in connection with the jury instructions either were not preserved by objection or proffer, *see Etcheverry v. State*, 107 Nev. 782, 784-85, 821 P.2d 350, 351 (1991) (regarding Instructions 9 and 14 in the underlying case), fail when considered in light of the instructions as a whole, *Tanksley v. State*, 113 Nev. 844, 849, 944 P.2d 240, 243 (1997) (Instruction 4), or involve instructions that were substantively correct (Instructions 12 and 15), improperly duplicative, *see Carter v. State*, 121 Nev. 759, 765, 121 P.3d 592, 596 (2005); *Bails v. State*, 92 Nev. 95, 96-97, 545 P.2d 1155, 1155-56 (1976), or not supported by the evidence. Thus, the district court did not abuse its broad discretion in settling the jury instructions. *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001).

We therefore affirm.

DOUGLAS, C.J., and HARDESTY, J., concur.