ROSENBAUM, Circuit Judge, dissenting:
 

 Today we hold that any ammunition may always be seized during a frisk when the searching officer immediately identifies it as ammunition, regardless of any surrounding circumstances. This is a new rule that we did not ask the parties to address, that neither party briefed, and that the government expressly declined to adopt at oral argument.
 

 Indeed, during oral argument, the Court asked the government, "Once you feel the bullet, the officer can seize the bullet. Is that the government's position?" Recording of Oral Argument dated Oct. 24, 2018, at 38:58. And the government responded without equivocation, "No, Your Honor."
 

 Id.
 

 Then the government explicitly stated, "We are not asking the Court to rule that a bullet in isolation in all circumstances
 would be sufficient to reach in [to the pocket and seize]; we are asking the Court to apply the facts-specific Fourth Amendment tests that this Court has applied and other courts have applied ... under the totality of the circumstances."
 
 Id.
 
 at 51:34.
 
 [1]
 

 Because we operate only "as arbiters of legal questions presented and argued by the parties,"
 
 Nat'l Aeronautics & Space Admin. v. Nelson
 
 ,
 
 562 U.S. 134
 
 , 148 n.10,
 
 131 S.Ct. 746
 
 ,
 
 178 L.Ed.2d 667
 
 (2011) (citations and internal quotation marks omitted), once the government disclaimed the
 
 per se
 
 rule at oral argument, we were left with only two permissible options: apply a true totality-of-the-circumstances test or rehear the case, ask the
 
 per se
 
 question to the parties and, if necessary, appointed counsel, and analyze the arguments presented. Instead, the Majority Opinion takes a third route and adopts the new
 
 per se
 
 rule on its own. That new rule may well be correct. Or it may not. But if we wanted to consider such a rule, we should have asked the parties to brief and argue it in this en banc proceeding, instead of asking them to brief and argue a more discrete question.
 
 [2]
 

 I organize my dissent from the Majority Opinion's decision to issue a rule on a question that was not before us, into three substantive parts. In Section I, I show that, despite the Majority Opinion's insistence to the contrary, the Majority Opinion creates the new rule that ammunition is always seizable during a proper
 
 Terry
 
 frisk, without consideration of the surrounding circumstances. In Section II, I recount the many ways we could have avoided ruling on a question that was not before us, and I note the consequences of engaging in such a review. And in Section III, I explain that I do not opine on the question that actually was before us because the Majority Opinion's new rule makes that question moot.
 

 I.
 

 This section demonstrates that today's Majority Opinion necessarily renders ammunition always seizable in a proper
 
 Terry
 

 [3]
 
 frisk. But before I get to that, I must acknowledge an awkward fact: the Majority
 Opinion insists that it has not established such a new rule. So of course, any reader likely and understandably will approach my dissent with some skepticism. In fact, my colleagues' views gave me serious pause-as they should have-that perhaps I had misread the Majority Opinion. So I have spent a lot of time closely reviewing and re-reviewing the Majority Opinion. But every reading has led me to the same conclusion: the Majority Opinion necessarily establishes the new rule that ammunition is always seizable in a
 
 Terry
 
 frisk. And district courts that must apply the lessons from the Majority Opinion will not logically be able to ever reach the conclusion that ammunition is not seizable in a permissible
 
 Terry
 
 frisk-no matter the circumstances.
 

 One other note to keep in mind while considering the practical holding of today's Majority Opinion: the Majority Opinion easily could have avoided creating its new rule today that all ammunition is always seizable in a
 
 Terry
 
 frisk. All it would have had to do is include one additional sentence limiting the broad principles that otherwise necessarily flow from the Majority Opinion's reasoning. But the Majority Opinion has refused to do so. I hope readers will ask themselves why. In the meantime, though, in Part A of this section, I describe the problematic aspects of the Majority Opinion and explain the easy fix that would prevent us from issuing our new rule today that ammunition is always seizable in a
 
 Terry
 
 frisk. In Part B, I discuss the problems with a stealth holding like the one the Majority Opinion necessarily produces today.
 

 A.
 

 The difficulties the Majority Opinion's reasoning creates begin at the second paragraph on page 10 of the Majority Opinion (beginning "As an essential part of a lethal weapon ...") and continue through the top of page 12. They arise because, in and of itself, the reasoning in question dictates today's holding that Johnson's bullet was properly seized-without reference to any actual circumstances existing at the time officers seized Johnson's bullet. So that same reasoning that made Johnson's bullet seizable here necessarily requires the conclusion that ammunition is always seizable during a proper
 
 Terry
 
 frisk. And under our prior-precedent rule, a holding that sneaks into our jurisprudence through the back door of reasoning is every bit as binding as one that openly announces its presence as it enters through the front door.
 
 Smith v. GTE Corp.
 
 ,
 
 236 F.3d 1292
 
 , 1304 (11th Cir. 2001) ("The fact that the [prior panel of the Court] did not explicitly say 'there is no common and undivided interest in a class claim for punitive damages' does not undermine the clear reasoning and result of that decision nor does it vitiate the resulting rule."). So unfortunately, the Majority Opinion's refusal to expressly own its holding today that all ammunition is always seizable during a permissible
 
 Terry
 
 frisk does not render the holding any less binding.
 

 In particular, to justify its determination that the ammunition here was seizable, the Majority Opinion reasons that when a bullet is present, so is a gun, "because common sense and logic dictate that a bullet is often associated with a gun" (the "bullet-means-gun" argument). Maj. Op. at 998 (citation, quotation marks, and alteration omitted). The Majority Opinion then goes on to opine that knowing the caliber of a bullet can be useful to determining the type of gun that might be present at the scene.
 
 Id
 
 . For this reason, the Majority Opinion concludes, the bullet was seizable since "Officer Williams had to find any gun to secure the scene and protect himself
 and others."
 
 Id
 
 . But there are two big problems with trying to glom this rationale onto the totality-of-the-circumstances test.
 

 First, as the Majority Opinion implicitly concedes, this reasoning is based on hypothetical "facts."
 
 See
 
 Maj. Op. at 998 ("Officer Williams's removal of the ammunition
 
 could have
 
 informed him of what caliber or type of gun might be nearby.") (emphasis added). Despite testifying at two separate evidentiary hearings, neither Officer Williams nor any other law-enforcement officer ever said that he or she sought to use or that he or she did in fact consult the caliber of the seized bullet to ascertain what type of gun might be lying around.
 
 [4]
 
 So it is simply not accurate to suggest that Officer Williams seized the bullet to somehow aid him in identifying the "caliber or type of gun" for which he was looking.
 

 Id.
 

 Consequently, the rationale that the ammunition was seizable so it could assist the officer in identifying and then locating a strewn weapon literally bears no relationship to the actual circumstances in Johnson's case.
 

 Because it is divorced from the circumstances of this case, the bullet-means-gun rationale cannot even arguably be viewed as part of any alleged totality-of-the-circumstances rationale for seizing the bullet here. Rather, it supports adoption of a
 
 per se
 
 rule. Instead of evaluating "the concrete factual circumstances that Officer Williams encountered,"
 
 id.
 
 at 10, the Opinion "weighs" an abstract fact that, while always true, was never actually considered here, under the guise of a circumstance-dependent test.
 

 But a second problem also plagues the bullet-means-gun argument. By the Majority Opinion's reasoning, every piece of ammunition will always give rise to the deduction that "a gun [is] in the vicinity," and every officer will always have to find any gun to secure the scene and protect himself and others. So if, as the Majority
 Opinion asserts, a bullet means a gun is present, and knowing the caliber of the bullet is important to "find[ing] any gun to secure the scene and protect [the officer] and others," in the absence of any limitation on these principles, the presence of a bullet and the corresponding need to know the caliber of it to assist in identifying the gun will always be sufficient, in and of themselves, to support seizure of the ammunition-regardless of any circumstances of the particular
 
 Terry
 
 stop.
 

 Nor is the bullet-means-gun argument the only one the Majority Opinion relies on that suffers from this problem. The Majority Opinion also justifies its determination that the bullet here was seizable on the ground that ammunition threatens the safety of officers and others because it is "an essential part of a lethal weapon," and "grave injury ... could [ ] be[ ] caused by ... ammunition if ... loaded into a gun" (the "intrinsic-danger" argument).
 
 Id
 
 . at 10. But what bullet is that
 
 not
 
 true of?
 

 To be sure, the Majority Opinion mentions "Johnson's ammunition" and "in these circumstances" in discussing the intrinsic-danger argument.
 
 See id.
 
 But the specified characteristics of ammunition on which the Majority Opinion actually relies in this argument are not unique to Johnson's single bullet. And even the most thorough of reviews reveals no effort whatsoever by the Majority Opinion to relate these general characteristics of all ammunition to the particular circumstances of Johnson's
 
 Terry
 
 frisk. As a result, the Majority Opinion's camouflage cannot and does not limit the reasoning wearing it.
 

 Rather, these intrinsic-danger characteristics of Johnson's ammunition are
 
 always
 
 true of
 
 all
 
 ammunition. So under the intrinsic-danger rationale, in the absence of any express limitation on the principle, all ammunition will always be seizable because, intrinsically, it always "threatens the safety of officers and others."
 
 Id.
 
 at 12. And because ammunition is seizable when it "threatens the safety of officers and others," and all ammunition always threatens "the safety of officers and others" under the intrinsic-danger rationale, all ammunition is always seizable during a permissible
 
 Terry
 
 frisk, without regard to any other considerations.
 

 So all courts in this Circuit are now bound to uphold the seizure of ammunition during a
 
 Terry
 
 frisk-whether the officer seizes the ammunition on a crowded street in the highest-crime neighborhood just before dawn and while the suspect is wearing bulky clothing and is unsecured, or whether the officer seizes the ammunition on a sunny day at an empty beach while the suspect is secured and clad in nothing more than a bikini. And it is pure sophistry to suggest that courts will be able to reach any other conclusions in cases involving ammunition, regardless of any other circumstances. Perhaps that is why the Majority Opinion does not even attempt to explain how any other answer is possible.
 
 [5]
 

 Nor is it any answer to this dilemma to simply note, as the Majority Opinion does, that to determine whether an officer may properly seize an item during a
 
 Terry
 
 frisk, we must "consider[ ] the nature of that object."
 
 Id.
 
 at 20. Of course, that is true.
 

 But significantly, the inquiry we must conduct about the nature of the item under the totality-of-the-circumstances framework is whether the nature of the seized item created a threat to the safety of officers and others
 
 under the particular circumstances the officer encountered
 
 -not whether the nature of the item always poses a threat to the safety of officers and others. The latter is a question we could ask if we were deciding whether to scrap the totality-of-the-circumstances test as applied to ammunition, as the Newsom and Branch Opinions openly advocate doing.
 

 In fact, the Branch Opinion-which expressly concludes that ammunition is always seizable during a proper
 
 Terry
 
 frisk because "a bullet is an instrument for the assault of the police officer," Branch Op. at 1008 (citation, internal quotation marks, and alteration omitted)-relies on the very same intrinsic-danger reasoning as the Majority Opinion to reach its conclusion. According to the Branch Opinion's reasoning, "aside from removing [ammunition], no precaution can eliminate the danger" ammunition poses, since a bullet's "only purpose is to be used with a firearm," and "a bullet located during a
 
 Terry
 
 frisk poses an inherent risk to the safety of the officers and the others nearby." Branch Op. at 1008. In other words, the Branch Opinion employs the intrinsic-danger rationale to expressly hold what the Majority Opinion implicitly (and necessarily) holds through the very same reasoning.
 

 The Majority Opinion easily could have avoided this problem and could have limited itself to holding only that the seizure of Johnson's ammunition was appropriate under the totality of the circumstances here, if it wanted to do so. All it needed to do is simply state that the bullet-means-gun and intrinsic-danger arguments, alone or in combination with only each other, are not enough, in and of themselves, to warrant seizure of ammunition during a permissible
 
 Terry
 
 frisk. A single sentence would do that trick. That's it.
 

 In fact, I expressly invited the Majority Opinion to do just that. And by this dissent, I renew my call.
 

 Tellingly, though, the Majority Opinion refuses to add any such language. We should ask ourselves why. If the Majority Opinion believes that the bullet-means-gun and intrinsic-danger arguments, alone or in combination with only each other, are not enough to warrant seizure of ammunition during a
 
 Terry
 
 stop, why will it not just say so?
 

 Because the Majority Opinion refuses to limit its reasoning today, under our prior-precedent rule, the Majority Opinion's bullet-means-gun and intrinsic-danger reasoning-which are applicable to all ammunition in all circumstances and not limited to the facts of Johnson's case-bind all courts in the Eleventh Circuit to rule ammunition always seizable during a proper
 
 Terry
 
 frisk.
 

 Even the Branch Opinion implicitly recognizes as much. True, the Branch Opinion states that it "join[s] the Majority Opinion in full." But significantly, that endorsement is qualified with two "clarif[ications]." Branch Opinion at 31. And those "clarif[ications]" preclude the Branch Opinion's analysis from supporting the Majority
 Opinion's totality-of-the-circumstances alternative holding. In particular, the Branch Opinion necessarily qualifies its endorsement of the Majority Opinion with the following two "clarif[ications]": that "(1) the totality of the circumstances analysis in
 
 Terry
 
 applies
 

 only
 

 when the officer is determining whether (a) to stop and (b) then to frisk the detained person; and (2) if the officer conducting the frisk complies with the scope of the search permitted by
 
 Terry
 
 and feels what the officer reasonably believes is a bullet, the officer
 

 may in all circumstances seize it
 

 ."
 
 Id.
 
 (emphasis added). In other words, the Branch Opinion expressly disavows the idea that the totality-of-the-circumstances test governs-or even applies in any way to-the question of whether ammunition may be seized during a permissible
 
 Terry
 
 frisk.
 
 [6]
 

 So the Branch Opinion's "clarif[ication]"-that the totality-of-the-circumstances analysis does not govern whether ammunition is seizable during a permissible
 
 Terry
 
 frisk because ammunition is always seizable during a permissible
 
 Terry
 
 frisk, regardless of the circumstances-cannot peacefully coexist with the Majority Opinion's claimed sole holding-that Johnson's ammunition was properly seized under an analysis of the totality of the circumstances existing after the frisk had already been properly embarked upon and at the time Williams recognized a bullet was in Johnson's pocket. Either the totality-of-the-circumstances analysis governs whether ammunition is seizable during a permissible
 
 Terry
 
 frisk, or it doesn't. And if it does, ammunition cannot then always be seizable during a proper
 
 Terry
 
 frisk. Otherwise, employing the totality-of-the-circumstances analysis to ascertain whether seizure of ammunition is allowed during a given permissible
 
 Terry
 
 frisk would be an utter waste of time.
 

 Rather, if a totality-of-the-circumstances analysis governs, that necessarily means that in at least some circumstances, ammunition will not be seizable. So the Branch Opinion's "clarif[ication]" of the Majority Opinion that ammunition is always seizable during a proper
 
 Terry
 
 frisk is not a "clarif[ication]" at all. Instead, it is necessarily an acknowledgment of the Branch Opinion's understanding that the Majority Opinion renders ammunition always seizable during a proper
 
 Terry
 
 frisk, without regard to the totality-of-the-circumstances test.
 

 What's more, two of the seven judges in the Majority signed the Branch Opinion, which endorses only the ammunition-is-always-seizable theory and necessarily repudiates the applicability of the totality-of-the-circumstances test to determining whether ammunition is seizable during a permissible
 
 Terry
 
 frisk. And since the Majority Opinion has two holdings, including that ammunition is always seizable during a proper
 
 Terry
 
 frisk, the only rationale receiving seven votes today is the Branch Opinion's rationale. It makes no difference that the Branch Opinion states that it "join[s] the majority opinion in full" because the Branch Opinion's "clarif[ication]"
 

 of the Majority Opinion necessarily means the Branch Opinion's concurrence in the Majority Opinion is qualified to endorse only the ammunition-is-always-seizable theory.
 

 Plus, even if we could overlook the fact that the Branch Opinion's "clarif[ications]" of the Majority Opinion necessarily qualify its concurrence in the Majority Opinion to supporting only the ammunition-is-always-seizable holding, the Majority Opinion would have two alternative holdings: the narrow one it trumpets-that the bullet here was seizable under the totality of the circumstances-and the broad one it declines to expressly acknowledge-that all ammunition is always seizable in a
 
 Terry
 
 frisk.
 

 And under those circumstances, make no mistake: as a practical matter, the Majority Opinion's stealth holding that ammunition is always seizable in a
 
 Terry
 
 frisk is the only holding that counts, regardless of whether the Majority Opinion openly admits that. Though alternative holdings are equally binding if they receive the support of a majority of judges considering the issue,
 
 see
 

 Bravo v. United States
 
 ,
 
 532 F.3d 1154
 
 , 1162 (11th Cir. 2008), the ammunition-is-always-seizable holding necessarily will devour the totality-of-the-circumstances holding in every case. So if the two holdings produce different answers to the question of whether ammunition is seizable in a
 
 Terry
 
 frisk in any given case, the holding that the ammunition is always seizable will always demand the overall conclusion that the ammunition is seizable.
 
 See
 

 United States v. Leon
 
 ,
 
 468 U.S. 897
 
 ,
 
 104 S.Ct. 3405
 
 ,
 
 82 L.Ed.2d 677
 
 (1984) (fruit of impermissible search admissible where officers reasonably believed in good faith that the search was valid).
 

 The Majority Opinion has no answer to this problem. Instead, it invokes everyone from Chief Justice John Marshall to Bryan Garner for the truism that judicial decisions are limited to the facts of the case before the court.
 
 See
 
 Majority Op. at 1002-03. But that does not respond to the problem here.
 

 Indeed, Garner's
 
 The Law of Judicial Precedent
 
 , which the Majority Opinion relies on,
 
 see
 
 Maj. Op. at 1002, explains that while a court decides only the case before it, "the rationale that carries the force of precedent is that without which the judgment in the case could not have been given, and not the reasoning articulated by the court," Bryan A. Garner,
 
 et al.
 
 ,
 
 The Law of Judicial Precedent
 
 , § 6, at 83 (2016) (citation and internal quotation marks omitted). In other words, our prior-precedent rule dictates an opinion's holding.
 

 Yet the Majority Opinion fails to account in any way for the prior-precedent rule, which today requires the conclusion that all ammunition is always seizable during a permissible
 
 Terry
 
 frisk. In fact, the Majority Opinion does not even mention the prior-precedent rule.
 

 So in sum, the bullet-means-gun and intrinsic-danger rationales apply to all ammunition, regardless of any surrounding factual circumstances, and we have declared today that each of these rationales requires the conclusion that ammunition represents a threat to the safety of officers or others. Since a threat to the safety of officers or others always justifies the seizure of an item during a permissible
 
 Terry
 
 frisk, in the absence of limiting principles, under our prior-precedent rule, the bullet-means-gun and intrinsic-danger rationales necessarily require all courts in this Circuit to now rule valid the seizure of ammunition during a proper
 
 Terry
 
 frisk, without consideration of any surrounding circumstances.
 

 The new rule we adopt may or may not ultimately be the right answer. But we should at least be forthright about what we are holding and about the consequences of today's decision. And we should ask for and consider the parties' positions in the process.
 

 B.
 

 A reader may wonder what difference it makes whether we openly announce our holding that ammunition is always seizable if the holding is nonetheless ascertainable from our reasoning today? In my view, a lot.
 

 It matters because we are a United States Court, and forthrightness is our stock in trade. We have a duty to be open and honest with Johnson, officers, members of the public, and federal courts about the practical legal consequences of our decision today.
 

 It matters because officers and members of the public who have not had reason to think about the practical legal consequences of the Majority Opinion's reasoning may be under the misimpression after today that ammunition is not always seizable in a
 
 Terry
 
 frisk. As a result, officers may (now unnecessarily) spend time weighing how dark it is or how much crime has been committed in a given locale before deciding whether to seize ammunition, potentially imperiling their safety if the Majority Opinion's rationale rendering all ammunition seizable is correct. And it matters to the privacy rights of the public who may (now mistakenly) believe that officers are not entitled to seize ammunition from their pockets in some scenarios.
 

 It matters because now busy courts in this Circuit will have to waste their time going through the motions of applying the totality-of-the-circumstances test to determine whether ammunition is seizable in a
 
 Terry
 
 frisk, only to ultimately have to hold in every single case that it is, regardless of the outcome of the totality-of-the-circumstances analysis.
 

 It matters because if Johnson wishes to seek certiorari on the question of whether ammunition is, in fact, always seizable under
 
 Terry
 
 or whether instead ammunition is seizable only if the totality of the circumstances warrants it, he will have to spend several pages of his petition just proving that the Majority Opinion establishes this rule.
 

 It matters because if members of the public knew we were going to consider announcing a rule that ammunition is always seizable in a
 
 Terry
 
 frisk, some-such as advocacy organizations for civil rights, law-enforcement officers, and gun enthusiasts, as well as criminal-defense-attorney organizations-may have wished to have filed
 
 amicus curiae
 
 briefs to assist us in evaluating the legal advisability of that position.
 

 And it matters because if, outside the strictures of our adversarial system, we are going to adopt a new rule no party advocated for, we have a duty to plainly state that that is what we are doing. And then we have a duty to explain why that extraordinary measure is necessary. If we can't, we should not adopt a new rule in this way.
 

 II.
 

 Perhaps the Majority Opinion does not expressly acknowledge its ammunition-is-always-seizable holding because we never asked the parties to brief the question it answers, neither party argued the ammunition-is-always-seizable position that the Majority Opinion's new rule adopts today, and the government expressly disavowed it during oral argument. In other words, we never subjected today's new rule to the adversarial process.
 

 Had we done so, we could have had more confidence in the Court's new rule. As Justice Gorsuch has explained, "[N]ormally ... the crucible of adversarial testing is crucial to sound judicial decisionmaking. We rely on it to yield insights (or reveal pitfalls) we cannot muster guided only by our own lights."
 
 Sessions v. Dimaya
 
 , --- U.S. ----,
 
 138 S.Ct. 1204
 
 , 1232-33,
 
 200 L.Ed.2d 549
 
 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (citation and internal quotation marks omitted);
 
 see also
 

 Greenlaw v. United States
 
 ,
 
 554 U.S. 237
 
 , 244,
 
 128 S.Ct. 2559
 
 ,
 
 171 L.Ed.2d 399
 
 (2008) ("[W]e normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do, and this must be particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before us.") (citation and quotation marks omitted);
 
 Maslenjak v. United States
 
 , --- U.S. ----,
 
 137 S.Ct. 1918
 
 , 1931-32,
 
 198 L.Ed.2d 460
 
 (Gorsuch, J., concurring in part and concurring in the judgment) (joined by Thomas, J.).
 

 Not only that, but "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."
 
 Nelson
 
 ,
 
 562 U.S. at
 
 148 n.10,
 
 131 S.Ct. 746
 
 (2011) (quoting
 
 Carducci v. Regan
 
 ,
 
 714 F.2d 171
 
 , 177 (D.C. Cir. 1983) (opinion for the court by Scalia, J.)). And the "doctrine of judicial self-restraint requires us to exercise the utmost care whenever we ... break new ground ...."
 
 Collins v. City of Harker Heights
 
 ,
 
 503 U.S. 115
 
 , 125,
 
 112 S.Ct. 1061
 
 ,
 
 117 L.Ed.2d 261
 
 (1992).
 

 This is especially true when we decide on the scope of a constitutional right.
 
 See, e.g.
 
 ,
 
 Nelson
 
 ,
 
 562 U.S. at
 
 148 n.10,
 
 131 S.Ct. 746
 
 ("In this case, petitioners did not ask us to hold that there is no constitutional right to informational privacy, and respondents ... thus understandably refrained from addressing that issue in detail. It is undesirable for us to decide a matter of this importance in a case in which we do not have the benefit of briefing by the parties ...."). And that is the case even more so when we determine the scope of a constitutional right while sitting en banc on rehearing. Indeed, "[a]n en banc ... rehearing is not favored and ordinarily will not be ordered unless ... the proceeding involves a question of exceptional importance." Fed. R. App. P. 35(a)(2). When a case "involves a question of exceptional importance," employing the powerful adversarial-testing tool is even more crucial to ensure we reach the best possible answer under the law. But we did not do that here.
 

 We could have. In fact, it was entirely within our control to do so.
 

 We are the ones who decide the question the parties must address for en banc rehearing. So we could have asked the parties to brief whether an officer may always seize ammunition when that officer immediately recognizes it during a
 
 Terry
 
 frisk or whether instead we must always apply
 
 Terry
 
 's totality-of-the-circumstances analysis to determine whether the seizure of ammunition is reasonable under the specific facts of a particular situation. But we did not ask that question.
 

 Left to their own devices, the parties argued over application of
 
 Terry
 
 's totality-of-the-circumstances test to the specific facts of this case-that is, whether Officer Williams's seizure of the single bullet was reasonable in light of the particular factual scenario that arose here. When we saw that neither party's briefing advocated for-or even addressed-a rule that would allow officers to always seize ammunition upon immediately recognizing it during a
 
 Terry
 
 frisk, we could have given the parties
 a supplemental-briefing instruction requiring them to comment on the issue. But we did not do that.
 

 We also could have appointed counsel to argue the position that no party chose to take: that an officer may always seize ammunition upon immediately recognizing it during a
 
 Terry
 
 frisk. To be sure, we have embraced the appointed-counsel procedure in the past when no party has adopted a particular side of a given issue.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.
 
 ,
 
 851 F.3d 1076
 
 , 1079 (11th Cir. 2017) (en banc) (listing court-appointed
 
 amicus curiae
 
 ). But we did not appoint counsel here.
 

 And even after oral en banc arguments, when it became clear a majority of this Court decided that it was considering affirming on the basis of today's new rule, it was not too late to solicit the parties' opinions and appoint counsel if necessary. We reserve time in our annual schedule for at least three en banc sessions every year. Sometimes we use them all; sometimes we don't. But they are always available. So we easily could have reset the case for a new en banc rehearing to occur in January-just three months after the first one.
 
 [7]
 
 Then we could have directed the parties to brief the question the Court decides without their input (or approval) today. If no one took today's Majority's position, we could have appointed counsel to brief it. But we did not do that, either.
 

 Yet now, without the benefit of briefing on this rule by any party before the Court-or even a decision from the district court here mentioning this rule-and over the government's disavowal at oral argument of the rule we adopt, we embrace a brand new rule. And this rule isn't new to just us. This rule is new to federal appellate jurisprudence: in the fifty years since the Supreme Court issued
 
 Terry
 
 , no other Circuit has adopted or expressly rejected this rule.
 
 [8]
 
 In fact, no other Circuit has even considered the precise question of whether an officer may always seize ammunition when that officer immediately recognizes it during a
 
 Terry
 
 frisk, or whether instead we must always apply
 
 Terry
 
 's totality-of-the-circumstances analysis to determine whether the seizure of ammunition is reasonable under the specific facts of a particular situation.
 
 [9]
 
 That makes subjecting the new rule to adversarial testing even more critical.
 

 But instead, the Majority has skipped the adversarial testing and on its own created the rule we adopt today. I think adversarial testing is a pretty important part of our judicial process-and we easily could have done it here. My colleagues offer no reason for why it is appropriate to avoid adversarial testing in this case, and I am not aware of one, either. So I cannot join my colleagues in announcing the Court's new rule.
 

 III.
 

 Instead of asking the parties to address whether ammunition is always seizable in a
 
 Terry
 
 frisk, without regard to the particular circumstances, we asked the parties to brief and argue whether the bullet here was reasonably seized under
 
 Terry
 
 's totality-of-the-circumstances framework.
 
 [10]
 
 So the Majority's decision making all ammunition seizable under all conditions, without regard to the totality-of-the-circumstances test poses a dilemma: I can either (1) substantively analyze and opine on the advisability of a rule that we did not ask the parties to brief, that that they did not argue, and that the government expressly disavowed-and in an en banc case, no less; or (2) analyze how the totality-of-the-circumstances test applies to the ammunition here in light of the particular circumstances adduced through the evidentiary hearings-the (non-en banc worthy) question we did ask the parties to brief and they did argue-even though in this Circuit, as a result of the Majority Opinion's new rule, that test has now become forever moot as it relates to ammunition.
 

 An important consequence arises from choosing which question to answer: the question reviewed limits the universe of answers we can reach.
 

 For example, the first question-whether ammunition is always seizable in a proper
 
 Terry
 
 frisk when the officer identifies ammunition-assumes that it may be possible under
 
 Terry
 
 for all ammunition as a class to be ruled seizable, without regard to any circumstances. As a result, the universe of potential answers to that question
 includes the conclusion that all ammunition as a class is seizable under
 
 Terry
 
 , without regard to any circumstances.
 

 But that answer is not possible in the universe defined by the second question-whether the totality of the circumstances here made it permissible for Officer Williams to seize the bullet from Johnson's pocket at the time he so identified it. The second question, which requires application of the totality-of-the-circumstances framework, necessarily anticipates that items subject to it will not be seizable under at least some circumstances. Indeed, if a certain type of item subject to the totality-of-the-circumstances test were always seizable based solely on the nature of the item itself, the particular circumstances under which it was seized would never matter, and the test would be meaningless as applied to that type of item. So under the second question-the only one we asked the parties to answer-if a certain type of item (such as ammunition) is subject to the totality-of-the-circumstances test, it must not be seizable in at least some circumstances.
 

 The Majority's answer in this case-which creates the rule that ammunition is always seizable, regardless of the circumstances-does not fall within the universe of possible answers we ourselves created for this en banc proceeding when we asked the parties to brief the totality-of-the-circumstances question. That brings me back to my dilemma: I can substantively analyze a question that was never at issue in these en banc proceedings, or I can apply a now-meaningless test (as it relates to ammunition) that is not capable of coming to the Majority Opinion's ultimate answer-that ammunition is always seizable.
 

 For the reasons I have explained in Section II, I am uncomfortable with the first course of action. I therefore respectfully decline to participate in it.
 

 As for the second, since the Majority Opinion effectively banishes the totality-of-the-circumstances test (when it comes to ammunition) to the Eleventh Circuit's attic, applying that now-defunct test to the particular circumstances surrounding the seizure of the single bullet here is an exercise that can serve no practical purpose. It cannot determine the outcome of this case, and it cannot even arguably make points that future courts considering motions to suppress ammunition seized in
 
 Terry
 
 frisks might find helpful, since the test no longer matters as it pertains to ammunition.
 

 The Majority Opinion criticizes this dissent for "refus[ing] to answer the one question [posed to the parties] that a majority of this Court voted to decide en banc."
 
 [11]
 
 Maj. Op. at 1003. But notably, the question we asked the parties to brief and they in fact briefed sought resolution of the case by applying the totality-of-the-circumstances test to the specific facts here. Though the Majority Opinion claims to "answer the very question the parties briefed and argued,"
 

 id.
 

 , as I have explained,
 
 see supra
 
 at Section I, the Majority Opinion's alternative ammunition-is-always-seizable holding-the only one that
 matters since it extinguishes the vitality of the totality-of-the-circumstances test as applied to ammunition in this Circuit-applies the totality-of-the-circumstances test no more than this dissent does.
 

 Charades may be fun at parties, but not in judicial opinions where officer safety and privacy rights hang in the balance. I therefore respectfully decline to engage in that activity.
 
 [12]
 

 IV.
 

 Today we issue a new rule we did not ask the parties to brief, they did not brief, and the government expressly disavowed. And we do this even though we could have obtained the parties' input on the question we decide today. I respectfully decline to participate in that activity. The parties' testing of the issues we decide is and should be the engine that drives our adversarial system.
 

 JILL PRYOR, Circuit Judge, joined by WILSON, MARTIN, and JORDAN, Circuit Judges, dissenting.
 

 A beat cop's job isn't easy, and it comes with substantial personal risk. Our law must provide police officers with sufficient discretion, and room for mistakes, that they can keep themselves safe. But officer safety is not the only interest at play here. The people whom officers police and protect have a Fourth Amendment right to be free from unreasonable searches and seizures. This case stands at the crossroads of these two very compelling interests. It's a crossroads where courts often find themselves. For more than half a century, the Supreme Court, faced with resolving the tension between these two interests, has adhered to the principle that after conducting an investigatory stop of a person "a law enforcement officer, for his own protection and safety, may conduct a patdown to find
 
 weapons
 
 that he reasonably believes or suspects are then in the possession of the person he has accosted."
 
 Ybarra v. Illinois
 
 ,
 
 444 U.S. 85
 
 , 93,
 
 100 S.Ct. 338
 
 ,
 
 62 L.Ed.2d 238
 
 (1979) (emphasis added) (explaining the rule announced in
 
 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 ,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968) ).
 
 [1]
 
 It has equally held fast to the corresponding principle that the permissible scope of a
 
 Terry
 
 frisk is "narrow," and "[n]othing in
 
 Terry
 
 can be understood to allow ... any search whatever for anything but weapons."
 

 Id.
 

 at 93-94
 
 ,
 
 100 S.Ct. 338
 
 (internal quotation marks omitted);
 
 see
 

 United States v. Valerio
 
 ,
 
 718 F.3d 1321
 
 , 1324 (11th Cir. 2013) (characterizing
 
 Terry
 
 as a "narrow exception to the probable cause requirement" that typically applies when an individual's Fourth Amendment rights are implicated).
 

 In this case, police officers lawfully stopped Paul Johnson, Jr., placed him on the ground, handcuffed him, and held him at gunpoint while one officer frisked him. During the frisk, Officer Dwight Williams felt a single bullet and a nylon holster in Mr. Johnson's front pants pocket and then reached into the pocket to seize these items. The seizure of the bullet and holster was unlawful under
 
 Terry
 
 . In holding otherwise, the majority has unjustifiably broadened the scope of
 
 Terry
 
 's narrow exception, tipping the balance too far in favor of law enforcement's desire to collect evidence and against the Fourth Amendment rights of the people they police. I respectfully dissent.
 

 My dissent proceeds in three parts. First, I explain why, under the totality of the circumstances in this case, the officers were not permitted to seize the bullet and holster from Mr. Johnson's pocket. Second, I explain why the majority's decision effectively-and wrongly, I say-creates a categorical rule that a freestanding bullet may be seized under
 
 Terry
 
 . Third, I explain my view that the majority opinion permits
 
 Terry
 
 frisks to be used for evidence gathering-something the Supreme Court expressly has forbidden.
 

 I. The Totality of the Circumstances Requires Suppression of the Bullet and Holster.
 

 The Fourth Amendment protects people "against
 
 unreasonable
 
 searches and seizures." U.S. Const. amend. IV (emphasis added). Interpreting that foundational principle, the Supreme Court has affirmed that "[t]he reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations."
 
 Grady v. North Carolina
 
 , --- U.S. ----,
 
 135 S.Ct. 1368
 
 , 1371,
 
 191 L.Ed.2d 459
 
 (2015). In the context of a stop and frisk, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."
 
 Terry
 
 , 392 U.S. at 21,
 
 88 S.Ct. 1868
 
 .
 

 A
 
 Terry
 
 frisk "must ... be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of [a] police officer" or "others nearby."
 

 Id.
 

 at 29
 
 ,
 
 88 S.Ct. 1868
 
 . That is because safety-of officers on the scene and the public at large-is the bedrock of
 
 Terry
 
 , the only valid purpose for a
 
 Terry
 
 frisk.
 

 Id.
 

 To determine whether a frisk was reasonable in its scope, we consider the totality of the circumstances.
 
 United States v. Cortez
 
 ,
 
 449 U.S. 411
 
 , 417,
 
 101 S.Ct. 690
 
 ,
 
 66 L.Ed.2d 621
 
 (1981).
 

 Here are the circumstances of the frisk of Mr. Johnson. In the early morning hours in Opa-Locka, Florida-a high-crime area-the local police department received a 911 call about a possible burglary in progress at a four-unit home. The 911 caller reported that a "person [was] trying to get through the window of [a] neighbor's house," and the dispatcher relayed to
 the police that the suspect was a black male wearing a white shirt. Doc. 22 at 6, 19.
 
 [2]
 
 Two officers, both of whom received the description of the person in question, arrived on the scene. There, they saw Mr. Johnson, a black male in a white shirt, coming from the back of the building where the reported incident had taken place. The officers drew their weapons, pointed them at Mr. Johnson, and ordered him to approach with his hands up. Mr. Johnson immediately complied. At this point, a third officer arrived. Officer Williams, who was one of the first two officers on the scene, told Mr. Johnson that he was being detained until the officers could "figure things out."
 
 Id.
 
 at 33. Another officer ordered Mr. Johnson to the ground near the parking area at the front of the building, Mr. Johnson immediately complied, and then Officer Williams handcuffed him while the other officers trained their weapons on him. Officer Williams then frisked Mr. Johnson. To recap: during the frisk, Mr. Johnson was handcuffed, lying on the ground, and surrounded by three armed officers.
 

 Officer Williams felt in Mr. Johnson's front pants pocket "a nylon piece of material; and then, underneath it, a round, hard-like, oval-shaped object, which led [him] to believe it was ammunition." Doc. 30 at 6. He reached into Mr. Johnson's pocket and removed a black nylon pistol holster and a single round of .380 caliber ammunition. When asked whether there were any "weapons or anything near that this ammunition and this holster goes to," Mr. Johnson said no. Doc. 22 at 10. The officers began sweeping the area for weapons that might have been thrown. At that point a fourth officer arrived and saw Mr. Johnson handcuffed on the ground, the bullet and holster lying next to him, and another officer standing over Mr. Johnson with his gun drawn. Officer Williams walked toward the back of the building, found a hole in the fence separating that property and the property behind it, and then found two firearms lying near the hole on the other side of the fence.
 

 Viewed in their totality, the circumstances of this case require suppression of the bullet
 
 [3]
 
 because no officer reasonably could have believed that a single bullet-without any accompanying indication or reasonable expectation of the presence of a firearm Mr. Johnson could access-posed a present safety threat.
 
 [4]
 
 I view as critical
 the combination of facts that before Officer Williams felt the bullet in Mr. Johnson's pocket, (1) there had been no report or indication of a weapon or an accomplice at the scene;
 
 [5]
 
 (2) at least two other armed officers had arrived at the scene; (3) Mr. Johnson had immediately, peacefully, and
 
 at gunpoint
 
 complied with the officers' commands; and (4) the officers had placed Mr. Johnson on the ground and handcuffed him.
 
 See, e.g.
 
 ,
 
 United States v. Miles
 
 ,
 
 247 F.3d 1009
 
 , 1011, 1015 (9th Cir. 2001) (reversing the district court and ordering suppression of a box of ammunition removed from a defendant's pocket during a
 
 Terry
 
 frisk, reasoning: "Having already used significant force to secure the scene for safety purposes [including handcuffing the suspect and having him kneel down], the officers cannot leverage the safety rationale into a justification for a full-scale search [of the suspect's pocket].");
 
 United States v. Reid
 
 ,
 
 351 F.Supp. 714
 
 , 718 (E.D.N.Y. 1972) ("With the weaponry in the hands of the agents trained on the suspects, a slapjack could hardly have been a threat to the arresting agents.").
 

 The majority opinion relies on other circumstances, including the time of day and accompanying darkness and the location of the incident in a high-crime area. Maj. Op. at 998;
 
 see
 
 Newsom Concurring Op. at 1004. Those facts, which the officers knew at the moment they initiated the stop, undoubtedly are "relevant contextual considerations" for the officers' decisions to stop, frisk, and seize a bullet from Mr. Johnson.
 
 Illinois v. Wardlow
 
 ,
 
 528 U.S. 119
 
 , 124,
 
 120 S.Ct. 673
 
 ,
 
 145 L.Ed.2d 570
 
 (2000). The same is true of the fact that Mr. Johnson matched the vague description given by the 911 caller. But by the time Officer Williams reached his hand into Mr. Johnson's pocket, he had much more specific information than he did when the officers initiated the stop and frisk. Officer Williams found no firearm or other weapon on Mr. Johnson's person. And, critically, Mr. Johnson was completely restrained and fully compliant, and the officers had neither obtained any information about nor observed any other person on the scene, much less a suspected accomplice. So at the time of the bullet's seizure, the general contextual considerations upon which the majority opinion relies provided little if any support for a "rational inference[ ]" that a single bullet in Mr. Johnson's pocket would pose a danger.
 
 See
 

 Terry
 
 , 392 U.S. at 21, 27,
 
 88 S.Ct. 1868
 
 .
 

 For the bullet to amount to a threat, Mr. Johnson, lying on the ground with his hands handcuffed behind his back, would have had to escape his handcuffs like Houdini, retrieve the bullet from the front pocket of his pants, escape from custody with guns trained on him, and find a matching gun to use the bullet. Or, under the majority opinion's accomplice theory, Maj. Op. at 1001, under the same conditions Mr. Johnson would have had to escape the handcuffs, retrieve the bullet, and then throw the single bullet-in the dark-to an accomplice waiting with a matching unloaded gun or receive a gun from a hidden and unreported accomplice and load the gun with the single bullet. None of these scenarios is plausible, much less reasonable. Neither supports a "rational inference[ ]" that the single bullet
 had to be seized for safety purposes.
 
 [6]
 

 See
 

 Terry
 
 , 392 U.S. at 21, 27,
 
 88 S.Ct. 1868
 
 .
 

 The majority opinion cites cases from other jurisdictions for the proposition that
 
 Terry
 
 authorizes officers to seize ammunition during a frisk.
 
 See
 
 Maj. Op. at 999. But in all of these cases, unlike here, the facts established or at least strongly suggested the immediate presence or possession of a firearm. In most, the officers directly observed a gun before or during the frisk.
 
 See, e.g.
 
 ,
 
 United States v. Ward
 
 ,
 
 23 F.3d 1303
 
 , 1304-06 (8th Cir. 1994) (frisk by a single officer of a "jumpy" and "nervous" suspect uncovered both a sawed-off shotgun and shotgun shells);
 
 State v. Smith
 
 ,
 
 136 Ariz. 273
 
 ,
 
 665 P.2d 995
 
 , 996-98 (1983) (officers observed that the suspect, who matched the description of a person seen threatening people with a sawed-off shotgun, had such a shotgun in his car);
 
 Scott v. State
 
 ,
 
 110 Nev. 622
 
 ,
 
 877 P.2d 503
 
 , 505 (1994) (frisk took place after a firearm was observed in the suspect's car);
 
 see also
 

 State v. Moton
 
 ,
 
 733 S.W.2d 449
 
 , 450-51 (Mo. Ct. App. 1986) (single police officer responding to a domestic violence call performed frisk after hearing suspect threaten to commit murder and seeing him toss aside a metallic object). These cases might provide glancing support for the majority opinion's holding, but they are too different on the relevant facts to be persuasive in Mr. Johnson's case.
 

 Perhaps realizing that these cases do not convincingly support its decision, the majority says that it is "aware of no precedential opinion to the contrary in any jurisdiction." Maj. Op. at 999. In fact, though, there are at least a couple of federal cases that cut against the majority's holding.
 
 See
 

 Miles
 
 ,
 
 247 F.3d at 1014-15
 
 (ordering suppression of a box of ammunition found in a suspect's jacket pocket during a
 
 Terry
 
 frisk, even though the suspect met the description of a person who had fired a gun, because "[w]hile the officer may have been patting down for a weapon, he had reached the outer limits of his patdown authority when it was clear that the object was a small box and could not possibly be a weapon.... At that point, the officer's further manipulation of the box was impermissible.");
 
 United States v. Lemons
 
 ,
 
 153 F.Supp.2d 948
 
 , 951, 959-62 (E.D. Wisc. 2001) (ordering suppression of 12 rounds of ammunition found in a sock in a suspect's pocket during a
 
 Terry
 
 frisk, even though a witness had said the suspect was in possession of a gun, because: "Sterling immediately knew upon patting Lemons down that the items in Lemons's pocket were not a weapon [and] did not immediately identify them as bullets until he squeezed[;] [thus] he went beyond the scope of a
 
 Terry
 
 pat-down search."). Although these cases differ from this one in that the officers suspected but were not positive that the items felt in the frisk were ammunition, the courts readily concluded that the items were not weapons and could not be further manipulated or seized as such. I find them compelling, particularly given
 
 Miles
 
 's similarities to this case-the late hour, a high-crime area, a report of a crime, and a handcuffed suspect-and its differences, too-fewer officers present, officers outnumbered by nearby observers, the report of a violent crime and a firearm at the scene, and the firearm ultimately found six feet from where the officers first spotted Mr. Miles.
 
 Miles
 
 ,
 
 247 F.3d at 1010-13
 
 . There, as
 should be the case here, the Ninth Circuit determined that "[h]aving already used significant force to secure the scene for safety purposes, the officers cannot leverage the safety rationale into a justification for a full-scale search."
 

 Id.
 

 at 1015
 
 .
 
 [7]
 

 II. A Bullet Is Neither a Weapon Nor a Hidden Instrument for the Assault of an Officer, so Officers Cannot Categorically Seize One.
 

 To repeat, because it's critically important,
 
 Terry
 
 is intended to be a "narrow exception" to the requirement that an officer have probable cause to search a person or seize his property.
 
 Valerio
 
 ,
 
 718 F.3d at 1324
 
 . In concluding that Officer Williams was entitled to seize a single bullet from Mr. Johnson's pocket under the circumstances of this case, the majority opinion effectively creates a categorical rule permitting officers to seize a freestanding bullet even absent reasonable cause to believe officer or bystander safety is at risk.
 
 [8]
 

 The majority opinion reasons that a bullet may be seized during a
 
 Terry
 
 frisk because it is an "essential part of a lethal weapon" and "an integral part of what makes a gun lethal." Maj. Op. at 998, 998. But
 
 Terry
 
 was careful to carve out an exception for
 
 weapons
 
 , not parts of weapons-no matter how integral to the weapon those parts might be. 392 U.S. at 24,
 
 88 S.Ct. 1868
 
 ("[I]t would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a
 
 weapon
 
 and to neutralize the threat of physical harm." (emphasis added));
 

 id.
 

 at 27
 
 ,
 
 88 S.Ct. 1868
 
 ("[T]here must be a narrowly drawn authority to permit a reasonable search for
 
 weapons
 
 for the protection of the police officer." (emphasis added)). And a freestanding bullet is neither a weapon nor lethal. As Judge Rosenbaum points out in her dissent, if a bullet always suggests a gun, then it is difficult to see when a bullet would be off limits to seizure. Rosenbaum Dissenting Op. at 1015-16. Further, the proposition that regardless of the surrounding circumstances a bullet necessarily suggests a gun, Maj. Op. at 998, such that seizure of a bullet is warranted, contradicts
 
 Terry
 
 's mandate that an officer have "specific and articulable" facts rendering reasonable his belief that the bullet could get into a gun to threaten the safety of police officers or others.
 
 Terry
 
 ,
 
 392 U.S. at 21
 
 ,
 
 88 S.Ct. 1868
 
 . The majority opinion has no satisfactory explanation for why it was reasonable
 for the officers here to believe they were in danger when Mr. Johnson was handcuffed on the ground with multiple officers pointing their weapons at him and no firearm was found on Mr. Johnson or within "those areas to which [Mr. Johnson] would generally have immediate control."
 
 Michigan v. Long
 
 ,
 
 463 U.S. 1032
 
 , 1050-51,
 
 103 S.Ct. 3469
 
 ,
 
 77 L.Ed.2d 1201
 
 (1983).
 

 Judge Branch in her concurrence expressly advocates for a categorical rule that officers are entitled to seize a freestanding bullet in the name of officer safety. She argues that just as we consider a gun without a bullet to be a weapon under
 
 Terry
 
 , we should consider a bullet without a gun "an instrument of assault in all circumstances." Branch Concurrence at 35. I am not persuaded. First,
 
 Terry
 
 expressly allows the seizure of guns, but we're having this discussion because it does not expressly allow seizure of a freestanding bullet.
 
 Terry
 
 , 392 U.S. at 29,
 
 88 S.Ct. 1868
 
 . Second, an officer who feels a bullet in a suspect's pocket can discern different facts than an officer who feels a gun. The former can readily observe that the bullet is not loaded into a gun, but the latter cannot readily observe that the gun has not been loaded with one or more bullets.
 
 Terry
 
 's requirement that a seizure be based on specific and articulable facts takes into account that some circumstances may counsel
 
 against
 
 seizure. Thoroughly frisking a person and finding what feels like a freestanding bullet but no gun may be one of those circumstances. And third, from the standpoint of safety-the
 
 sine qua non
 
 of
 
 Terry
 
 -it makes sense that we don't require officers to rely on the possibility that a gun in a person's pocket is not loaded. Although Judge Branch is entirely correct that a bullet has no use except as part of an instrument of assault, it doesn't follow that a freestanding bullet is "an instrument of assault in all circumstances." Such a bright line rule runs afoul of the particularized analysis
 
 Terry
 
 requires and of the principles animating
 
 Terry
 
 's narrow exception.
 
 See
 

 Grady
 
 ,
 
 135 S.Ct. at 1371
 
 ("The reasonableness of a search depends on the totality of the circumstances ....");
 
 Cortez
 
 ,
 
 449 U.S. at 417
 
 ,
 
 101 S.Ct. 690
 
 ("[T]he totality of the circumstances-the whole picture-must be taken into account.").
 

 III. The Majority Opinion Permits
 
 Terry
 
 Frisks to Be Used to Gather Evidence, Contrary to the Supreme Court's Clear Directive.
 

 Make no mistake: the majority opinion's conclusion that a single freestanding bullet could be used as a weapon is a significant extension of
 
 Terry
 
 , one unwarranted under
 
 Terry
 
 's safety rationale. That is not all. The Supreme Court has "condemned" evidentiary searches conducted under the guise of
 
 Terry
 
 ,
 
 Minnesota v. Dickerson
 
 ,
 
 508 U.S. 366
 
 , 378,
 
 113 S.Ct. 2130
 
 ,
 
 124 L.Ed.2d 334
 
 (1993), and yet that is exactly what the majority opinion countenances today. Instead of considering the bullet to be a safety threat, Officer Williams left it on the ground near Mr. Johnson. He testified that he used the seizure of the bullet to search the area for a gun that the bullet "goes to," Doc. 22 at 10; in other words, he used the frisk to initiate the precise sort of search that
 
 Terry
 
 forbids. Rather than running from this fact, the majority relies on it-explaining that removing and examining the bullet in Mr. Johnson's pocket might have expedited the officers' search for a .380 caliber gun in the vicinity. Maj. Op. at 998. The Supreme Court "has been sensitive to the danger that officers will enlarge a specific authorization ... into the equivalent of a general warrant to rummage and seize at will."
 
 Dickerson
 
 ,
 
 508 U.S. at 378
 
 ,
 
 113 S.Ct. 2130
 
 (alteration adopted) (internal quotation marks omitted).
 

 Unfortunately, the majority opinion is not sensitive to that danger today.
 

 * * *
 

 The panel correctly held that the seizure of a bullet and holster from the pocket of Mr. Johnson-who was compliant with officers' commands, on the ground, handcuffed behind his back, and held at gunpoint by several officers-constituted an unreasonable seizure under
 
 Terry
 
 and its progeny.
 
 See
 

 United States v. Johnson
 
 ,
 
 885 F.3d 1313
 
 , 1323-24 (11th Cir. 2018). With respect, I dissent from the majority opinion's contrary holding.
 

 An unloaded gun, unlike most rounds of ammunition in civilian use, can nonetheless be used as a weapon (i.e., a club) but certainly an officer seizing a gun is primarily doing so because its intended purpose presents the gravest threat to the officer.
 

 Surveying Fourth Amendment law in the early 20th century, Justice Cardozo essentially came to the same conclusion while serving on the New York Court of Appeals: "Search of the person is unlawful when the seizure of the body is a trespass, and the purpose of the search is to discover grounds as yet unknown for arrest or accusation[.] Search of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting the body of the accused to its physical dominion."
 
 People v. Chiagles
 
 ,
 
 237 N.Y. 193
 
 , 197,
 
 142 N.E. 583
 
 (1923) (citation omitted).
 

 See also
 
 Majority Op. at 1003 (describing Johnson as having argued in his brief that "Officer Williams was not entitled to seize the ammunition from his pocket because 'the bullet
 
 in this particular case
 
 posed no conceivable threat to officer safety' " and the government as having argued in its brief that " 'Officer Williams was justified in retrieving the bullet because a reasonable officer
 
 under the circumstances
 
 could conclude that the bullet [wa]s an instrument of assault that could pose a danger to himself and other[s].' ") (emphasis added).
 

 Judge Newsom's and Judge Branch's opinions openly acknowledge that they endorse this new
 
 per se
 
 rule. Without opining on the substance of the Newsom and Branch Opinions, but from a judicial-procedure perspective only, I respectfully disagree that in these en banc proceedings, we should adopt the new
 
 per se
 
 rule they advocate. Nevertheless, I don't take issue with suggesting new theories in non-majority opinions, as they can initiate thought and trigger development of the law in future cases. I also applaud Judge Newsom's and Judge Branch's Opinions' transparency about their reasoning and consequences. In contrast, the Majority Opinion declines to acknowledge that it adopts the same rule for which the Newsom and Branch Opinions advocate. But that does not mean that the Majority Opinion does not so hold. As Section I of this dissent demonstrates, the Majority Opinion necessarily sanctions this new rule as much as the Newsom and Branch Opinions do. And because this new rule will always require the conclusion that the seizure of ammunition was permissible in any given proper
 
 Terry
 
 frisk, regardless of the surrounding circumstances, that is the only holding that matters today.
 

 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 ,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968).
 

 Of course, it's impossible to cite a part of the testimony that proves that no officer testified that he or she actually consulted the caliber of the gun to assist in finding a weapon with a matching caliber. So instead, I quote the part of Officer Williams's testimony that comes closest. Yet even the most careful review of that testimony reveals that it still does not support the idea that Officer Williams actually consulted the caliber of the bullet and then used knowledge of the bullet's caliber to assist in finding a gun of that same caliber:
 

 Q: After you found the ammunition and the holster, what did you do?
 

 A: I then retrieved it and notified the officers in the area and asked him was there any more weapons or anything near that this ammunition and this holster goes to.
 

 Q: What did the defendant say?
 

 A: He said no.
 

 Q: Finding a person at 5 in the morning with ammunition and a holster in their pocket, what did you think to do next?
 

 A: Canvas the area to see if the weapon was possibly thrown. We have that a lot in Opa-Locka.
 

 Q: Why would you be looking for weapons to have been thrown? Can you explain that?
 

 A: I was looking for the weapons to be thrown because the round that was in his pocket and the holster led me to believe that there is a weapon that the round goes to and something goes into that holster.
 

 Q: So ultimately, Officer, what did you continue to do?
 

 A: Officer Holborow then looked in the west side of the neighbor's yard to see if he had possibly thrown anything over there. I then walked towards the back where I found a-to the back of the listed location where I found a hole in the fence. I then got in my car and drove around the block to the north side of that duplex across the fence where I found two pistols laying near the hole.
 

 Rather, Officer Williams's testimony shows only that he relied on the fact that he found a bullet in general to conclude that a gun in general might be around.
 

 The Majority Opinion asserts it does not answer this question because "we are not in the business of issuing advisory opinions ... that merely opine on what the law would be upon a hypothetical state of facts." Majority Op. at 1003-04 (citations and alterations omitted). I agree that we cannot issue advisory opinions. But that's not what this question calls for. Though it is certainly hypothetical that the officers here relied on the caliber of the bullet to help them identify the type of firearm for which they were looking-despite the Majority Opinion's reliance on this supposition-there is nothing hypothetical about the general proposition that a bullet often means a gun is in the vicinity or that knowing the caliber of ammunition can assist in finding a matching firearm. Nor is there anything hypothetical about the general proposition that ammunition makes guns lethal. And since the Majority Opinion refuses to limit its holding by saying these characteristics about ammunition are not, alone or in combination only with each other, determinative of whether ammunition may be seized,
 
 see
 

 infra
 
 at 1017, no other facts matter.
 

 See also
 

 id.
 
 at 1007 ("The initiation of the stop and the initiation of the pat down are the only two points in the encounter at which the officer's reasonable belief must be assessed based on the totality of the circumstances."); 1008 ("If an officer discovers a bullet during a frisk lawful under
 
 Terry
 
 , the officer is entitled to seize the bullet as it is an instrument of assault
 

 in all circumstances
 

 .") (emphasis added); 1008 ("[H]aving found a bullet pursuant to a
 
 Terry
 
 frisk, an officer is permitted to seize it in the same manner as he would a gun."), ("[I]t is reasonable
 

 under all circumstances
 

 for the officer to protect his safety and that of others nearby by removing the bullet.") (emphasis added); 1009 ("[A]nytime an officer conducts a lawful
 
 Terry
 
 frisk, the officer may seize any bullet located during the frisk.").
 

 Or if we thought the issue just couldn't wait three months, we could have done what we did this past summer, when we added an en banc argument that we heard at a time that was not previously on our annual schedule.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Ovalles v. United States
 
 ,
 
 905 F.3d 1231
 
 (11th Cir. 2018) (en banc) (argued July 9, 2018).
 

 The Majority Opinion cites
 
 United States v. Ward
 
 ,
 
 23 F.3d 1303
 
 , 1306 (8th Cir. 1994), for the proposition that "an officer may seize ammunition when it threatens the safety of officers and others."
 
 See
 
 Majority. Op. at 999. I agree with this general proposition, but whether ammunition threatens the safety of officers and others has, until now, been assessed in light of the totality of the circumstances. And in
 
 Ward
 
 , the Eighth Circuit upheld the seizure of shotgun shells seized from a suspect's pocket based on the fact that, under the circumstances of that case, they were contraband-not based on the idea that ammunition is always seizable because it is ammunition.
 
 See
 

 Ward
 
 ,
 
 23 F.3d at
 
 1306 (citing
 
 Minnesota v. Dickerson
 
 ,
 
 508 U.S. 366
 
 ,
 
 113 S.Ct. 2130
 
 ,
 
 124 L.Ed.2d 334
 
 (1993), for the proposition that "contraband may be seized during a
 
 Terry
 
 stop").
 

 Of the five state jurisdictions the Majority Opinion cites,
 
 see
 
 Majority. Op. at 999, only Nevada has issued a holding consistent with the Majority's conclusion today that ammunition is always seizable. In
 
 Scott v. State
 
 ,
 
 110 Nev. 622
 
 ,
 
 877 P.2d 503
 
 , 509 (1994), Nevada's Supreme Court upheld the retrieval of ammunition from the suspect's pocket and noted that "it is reasonable for an officer, as a precautionary measure, to retrieve and separate from a suspect during the course of a
 
 Terry
 
 stop and frisk, either weapons or ammunition or both." In doing so, it offered no analysis of how
 
 Terry
 
 fits into the picture or of anything beyond
 
 Scott
 
 's single statement quoted above and in the Majority Opinion. Instead, it relied on
 
 Ward
 
 ,
 
 State v. Smith
 
 ,
 
 136 Ariz. 273
 
 ,
 
 665 P.2d 995
 
 , 998 (1983) (en banc),
 
 People v. Lewis
 
 ,
 
 123 A.D.2d 716
 
 ,
 
 507 N.Y.S.2d 80
 
 (N.Y. App. Div. 1986), and
 
 State v. Moton
 
 ,
 
 733 S.W.2d 449
 
 , 451 (Mo. Ct. App. 1986). But the courts in each of those cases upheld the seizure of the ammunition based on the totality of the particular circumstances-not on the fact that what was seized was ammunition. The same is true of the other state-court case the Majority Opinion cites,
 
 People v. Colyar
 
 ,
 
 374 Ill.Dec. 880
 
 ,
 
 996 N.E.2d 575
 
 (Ill. 2013).
 

 In my view, as argued, this is not an en-banc-worthy issue. While it is certainly a good thing to provide clarity to police officers doing their jobs, the question we asked necessarily turns on the specific facts of the given case. So no answer can give broad instruction to officers trying to ascertain when it is appropriate to seize ammunition in the course of a
 
 Terry
 
 frisk. As a result, as the issue has been argued here, this case does not raise a question of "exceptional importance," Fed. R. App. P. 35(a)(2), as that term of art is understood.
 
 See
 

 Bostock v. Clayton Cty. Bd. of Comm'rs
 
 ,
 
 894 F.3d 1335
 
 , 1336 n.1 (11th Cir. 2018) (Rosenbaum, J., dissenting from the denial of rehearing en banc);
 
 see also
 

 Mendoza v. Borden, Inc.
 
 ,
 
 195 F.3d 1238
 
 , 1269 n.12 (11th Cir. 1999) (Tjoflat, J., concurring in part and dissenting in part) (opining that a hostile-work-environment sexual-harassment case was not en banc-worthy because it "was a rather routine decision that rested on an extremely fact-intensive review"). And based on the Majority Opinion's new rule that all ammunition is always seizable in a
 
 Terry
 
 frisk, regardless of the circumstances-a rule that moots the totality-of-the-circumstances test when it comes to ammunition-the Majority Opinion apparently agrees that the question as framed was not, in and of itself, en-banc worthy.
 

 The Majority Opinion further seems to imply that I do not answer because I "deem[ ] [the question of whether the bullet was properly seized under the totality-of-the-circumstances framework] non-en-banc worthy."
 
 Id.
 
 at 21. Not so. True, I do fully believe that the issue we asked the parties to brief and argue is not en-banc worthy by the standard Rule 35(a)(2) imposes-and even more so as Circuit Courts have construed this standard.
 
 See
 

 supra
 
 at 1023 n.10. But that has nothing to do with why I do not apply the totality-of-the-circumstances test today. Rather, as I have explained, I respectfully decline to apply the totality-of-the-circumstances test because in this Circuit, it is now a relic as applied to ammunition, so nothing I write on that test's application to these facts can possibly be useful.
 

 I understand and respect my colleagues' Dissents, which have chosen to apply or otherwise comment on the test we asked the parties to brief, even though the Majority Opinion today moots it. Judges Jill Pryor and Jordan were on the original panel that understandably applied the totality-of-the-circumstances test, and it makes sense why they would want to explain the reasons supporting that panel's decision. I, however, was not a part of that panel and have not previously applied the totality-of-the-circumstances test to the particular facts of the case before us. And I see little reason under the circumstances to apply that test to the single bullet here for the first time now that the test effectively has no meaning in this Circuit when it comes to ammunition.
 

 Doc. # refers to the numbered entry on the district court's docket.
 

 Given the evidence in this case-including testimony that Officer Williams realized during the frisk that Mr. Johnson had a bullet in his pocket and that Opa-Locka officers always canvass the area where a person suspected of possessing weapons is detained-it seems to me that the firearms inevitably would have been discovered by law enforcement, thereby dooming Mr. Johnson's request for suppression.
 
 See
 

 Utah v. Strieff
 
 , --- U.S. ----,
 
 136 S.Ct. 2056
 
 , 2061,
 
 195 L.Ed.2d 400
 
 (2016) ("[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source.");
 
 United States v. Lemons
 
 ,
 
 153 F.Supp.2d 948
 
 , 965-67 (E.D. Wisc. 2001) (applying the inevitable discovery doctrine to deny suppression of a firearm found after an unconstitutional seizure of bullets under circumstances similar to those in this case). But the government did not press this theory in the district court, choosing instead to argue only that Officer Williams's seizure of the bullet and holster from Mr. Johnson's pocket (before any firearms were discovered) was within the scope of Officer Williams's
 
 Terry
 
 frisk. So we must decide this case based on whether the seizure of the bullet and holster came within the permissible scope of a
 
 Terry
 
 frisk.
 

 Neither the officers nor the majority attempts to justify the removal of the nylon holster, an item Officer Williams never suspected was a weapon or contraband.
 
 See
 
 Jordan Dissenting Op. at 1011 n.4.
 

 True, the officers testified that in their experience armed burglaries in the area often were committed by more than one person. They did not, however, testify that most of the burglaries they encountered were armed-just that some were. At any rate, the officers' general experience was belied by the facts confronting them: a 911 call reporting one individual with no mention of a weapon and, at the scene, a single individual who appeared-and was confirmed-to be unarmed.
 

 Although it is immaterial to our reasonable suspicion analysis-an objective inquiry-the officers in this case worried so little about the bullet after seizing it that they left it on the ground near Mr. Johnson. If a bullet, in and of itself, creates a safety concern, leaving it on the ground near a handcuffed suspect makes the situation no safer than leaving the bullet in his pocket.
 

 Though the majority opinion correctly notes that handcuffs are not always secure, Maj. Op. at 1001, it's a bridge too far to say that it's reasonable for officers to assume in every case that a handcuffed suspect is unsecured. And, in any event, plenty of additional facts in this case indicated the officers' safety and the scene's security: three officers were present, their weapons were drawn and trained on Mr. Johnson, Mr. Johnson was completely compliant throughout the encounter, the officers perceived no other individuals in the area, and no firearm was ever reported or observed before or during the frisk. When the guns ultimately were found, they were found beyond Mr. Johnson's reach. If
 
 Miles
 
 was a difficult case, this is an easier one.
 

 To be clear, a decision that hewed closely to
 
 Terry
 
 would not prevent officers from seizing bullets or prosecutors from initiating prosecutions such as the one initiated here under
 
 18 U.S.C. § 922
 
 (g). They could do both provided they had probable cause for the seizure.
 
 See
 
 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.6(c) (5th ed. Oct. 2018 update) ("Assuming the object discovered in the pat-down does not feel like a weapon, this only means that a further search may not be justified under a
 
 Terry
 
 analysis. There remains the possibility that the feel of the object, together with other suspicious circumstances, will amount to probable cause that the object is contraband or some other item subject to seizure, in which case there may be a further search based upon that probable cause.").